## OKLAHOMA BELT R. CO. v. SCHAFF.

(Circuit Court of Appeals, Eighth Circuit. June 16, 1922.)

No. 5912.

I. **Carriers** ⬗⟹35—**Receiver's contract to transport chats for ballasting for company constructing and leasing line to receiver held valid.**

Where plaintiff, who contracted to construct and lease a line of railway to the receiver of another road for the period of receivership, with an option to continue for 10 years and with trackage rights after expiration of lease, was not required to ballast road, receiver's agreement, in consideration of fact that ballasting would reduce expense of maintenance and operation, to transport chats for ballasting for cost of transporting in work trains, instead of amount fixed by tariffs filed with the Interstate Commerce Commission, was valid.

2. **Railroads** ⬗⟹210—**Contract made by receiver's chief operating officer held binding.**

A contract made by a railroad receiver's chief operating officer, whose duties were substantially those of a railroad company's general manager, for the transportation of chats to be used in ballasting a line of railway to be leased to the receiver for the cost of transportation in work trains, was binding on the receiver, though not approved by him personally.

Stone, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action by Charles E. Schaff, as receiver of the Missouri, Kansas & Texas Railway Company, against the Oklahoma Belt Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed, with directions.

George A. Henshaw, of Oklahoma City, Okl. (A. Carey Hough, of Oklahoma City, Okl., and Luther M. Walter, of Chicago, Ill., on the brief), for plaintiff in error.

M. D. Green, of Muskogee, Okl. (Joseph M. Bryson, of St. Louis, Mo., on the brief), for defendant in error.

Before CARLAND and STONE, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. This is a writ of error to review a judgment in favor of the plaintiff, the defendant in error in this court. The cause was submitted in the court below upon an agreed statement of facts; a trial to a jury having been waived by stipulation in writing:

"Agreed Statement of Facts.

"It is hereby stipulated and agreed that, in addition to the facts alleged in paragraphs 1, 2, 3, 4, and 5, of the plaintiff's petition, which are admitted by the defendant's amended answer herein, the following facts are hereby agreed to:

"That pursuant to the provisions of the contract attached to the plaintiff's petition and identified as Exhibit A, which contract is made a part of this agreed statement of facts in so far as the same may be relevant, the defendant did acquire the necessary right of way and property for the construction of its line of railway from a point of connection with the line of railway in the

⬗⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

possession of the plaintiff at the point marked 'A' on the blueprint maps attached to said contract to the point marked 'B' on said maps, and along the line indicated in red on said maps, and proceeded to have a railway constructed thereon in a good and substantial manner according to the plans and specifications agreed upon between the chief engineer of the plaintiff and the chief engineer of the defendant, as provided in said contract, to wit:

" 'Section 1. The Belt Company agrees within three (3) months from the date hereof, at its own expense, to acquire the necessary rights of way and ordinance rights for the construction of its line of railway from a point of connection with the line of railway in the possession of the receiver at the point marked 'A' on said Exhibit A to the point marked 'B' thereon, and along the line indicated in red, and to construct in a good and substantial manner a railway thereon according to the plans and specifications to be agreed upon between the parties hereto, or their chief engineers or other representatives designated for that purpose.'

"That Leon F. Lonnbladh, chief engineer of the plaintiff, and C. E. Smith, chief engineer of the defendant, agreed that the construction of said road (by the plaintiff, who had agreed to construct the same for the defendant) with native earth, in so far as the embankments and roadbed was concerned, was a full and complete compliance with section 1 of said contract above set forth, and wherein said section provides: 'And to construct in a good and substantial manner a railway thereon according to the plans and specifications to be agreed upon between the parties hereto or their chief engineers, or other representatives designated for that purpose.' The chief engineer of the plaintiff stated to the chief engineer of the defendant that, inasmuch as the plaintiff was under contract to operate and maintain the road being built for a period of ten years, the expense of maintenance and operation would be greatly reduced if the road was ballasted, whereupon the two engineers reached the following agreement:

"That the plaintiff was to deliver chats for the ballasting of said road on the road at Oklahoma City, and the defendant agreed to pay an amount for said ballast not to exceed 60 cents per cubic yard, the exact amount to be ascertained, based upon the cost of chats at the mines and the cost of transporting same to Oklahoma City in work trains on a work train basis as determined by the plaintiff.

"That thereafter said agreement was submitted by the engineer of the plaintiff to Mr. Webb, chief operating officer of the plaintiff, who approved the said contract and authorized and assisted in the consummation thereof; that the duties of a chief operating officer are substantially the same as the duties of a general manager of a railroad not in the hands of a receiver.

"It is further agreed that this subsequent contract was never submitted to Charles E. Schaff, the receiver, and that Mr. Schaff, as such receiver, did not approve or disapprove said contract or arrangement until after the consummation thereof, but that when the matter was called to Mr. Schaff's personal attention he did disapprove of it; that the said Charles E. Schaff had no personal knowledge of the same; that the defendant did not know whether or not the chief operating officer submitted the same to Mr. Schaff, and did not know whether or not Mr. Schaff personally had any knowledge of the same, or whether or not he had approved the same.

"It is further agreed that the plaintiff did during the months of May, June, July, August, and September, 1917, procure chats at the mines located at or near Chitwood, Mo., in the aggregate amount of 12,492 cubic yards, and transported the same from that point over plaintiff's lines of railway in work trains to Oklahoma City in cars furnished by the plaintiff and there delivered the same on the railway which the plaintiff was building for the defendant and placed the same on said railway so being constructed; that the said chats were originally billed as company material, consigned to T. G. Banks, division engineer of plaintiff, at Oklahoma City, and that the plaintiff's station agent at Oklahoma City, some time after the receipt of said shipments changed the waybills to show the Oklahoma Belt Railroad Company as the consignee, and reported them to plaintiff as revenue waybills. It is further agreed that the defendant was not notified, and had no knowledge, of the change of said waybills from 'deadhead' or company freight to revenue waybills until September

282 F.—9

or October, 1918, or more than a year from the time said chats were moved, and it is agreed that the increased amount now claimed by the plaintiff and for which a recovery is sought in this case was not presented to the defendant, and that the defendant had no notice or knowledge of the same, until September or October, 1918, or more than a year after the chats moved.

"It is further agreed that the plaintiff rendered a statement to the defendant in accordance with the contract hereinbefore mentioned, based upon 10 cents per cubic yard and actual work train cost of transportation, or $5,983.67, which was duly paid by the defendant; that the said $5,983.67 account was rendered under this second or special contract to ballast said road, and that it was not connected with nor an act arising out of the original contract for the construction of said road by the plaintiff for the defendant.

"It is further agreed that at the time said service was performed the tariffs and schedules of the plaintiff, duly filed with the Interstate Commerce Commission and in effect, prescribed the charges for the transportation of chats in interstate commerce from Chitwood, Mo., to Oklahoma City, Okla., over the line of railway of plaintiff, when said chats were to be used for general or commercial purposes, but not for railroad purposes of the plaintiff; that by the charges so fixed in said tariffs and schedules the total amount thereof for transporting the 12,492 cubic yards of chats between said points would be $14,138.40, which sum, added to the purchase price of 10 cents per cubic yard, or $1,249.20, makes a total of $15,387.60, which last-mentioned sum is $9,403.93 in excess of the sum of $5,983.67 heretofore paid plaintiff by the defendant, as above set forth.

"It is further agreed that the ballast placed upon said road by the plaintiff inured to the benefit of the plaintiff in reduced maintenance expense and reduced operating expense.

"It is further agreed that the plaintiff was to operate the road in question for a period of ten years under the terms of the original contract attached to plaintiff's petition, as Exhibit A; that the ballast which was put in said road at the instance and request of said plaintiff under the subsequent contract was for the benefit of the plaintiff.

"It is further agreed that the defendant was not obligated or required to ballast this track under and by the terms of the contract by which it was to construct this track, and by which contract the plaintiff agreed to operate said road for a period of ten years, and which was attached to plaintiff's petition as Exhibit A, and but for the subsequent contract or arrangements whereby said road was ballasted the plaintiff would have been required to operate said road without ballast and maintain the same for a period of ten years, or ballast the same at its own expense.

"It is further agreed that there is, and was, no tariffs on file, at the time the chats in controversy were transported, prescribing rates for interstate transportation of chats, except for commercial purposes, as above stated.

"It is further agreed that this case may be submitted to the court for final determination without a jury on the foregoing statement of facts; a jury being hereby expressly waived.          M. D. Green and
                                        "C. G. Horner,
                                              "Attorneys for Plaintiff.
                                        "Henshaw & Hough,
                                              Attorneys for Defendant."

The contract referred to in the agreed statement of facts is as follows:

"This contract, made and entered into this 1st day of April, 1917, by and between the Oklahoma Belt Railroad Company, a railroad corporation organized and existing under and by virtue of the laws of the state of Oklahoma, hereinafter for convenience designated 'Belt Company,' party of the first part, and Charles E. Schaff, as receiver of Missouri, Kansas & Texas Railway, hereinafter for convenience designated 'the receiver,' party of the second part, Witnesseth that:

"Whereas, the Belt Company, under its charter and the laws of Oklahoma, is authorized to construct, maintain, and operate a line of railway extending

from what is known as 'Packingtown and the Stockyards district' in the city of Oklahoma City, Oklahoma, to a point of connection with railway in the possession of the receiver, as shown in red upon a blueprint map hereto attached, marked Exhibit A, and made a part hereof; and

"Whereas said proposed line of railway could and can be operated as an extension of the line of railway in possession of the receiver:

"Now, therefore, in consideration of the premises and the mutual covenants hereinafter contained, to be by the parties hereto respectively kept and performed, it is agreed as follows:

"I. The Belt Company agrees within three (3) months from the date hereof, at its own expense, to acquire the necessary rights of way and ordinance rights for the construction of its line of railway from a point of connection with the line of railway in the possession of the receiver at the point marked 'A' on said Exhibit A to the point marked 'B' thereon, and along the line indicated in red, and to construct in a good and substantial manner a railway thereon according to the plans and specifications to be agreed upon between the parties hereto, or their chief engineers or other representatives designated for that purpose.

"II. Upon the completion of the railway of the Belt Company as hereinabove provided, the Belt Company agrees to and does hereby lease and let the same from the date of the completion thereof unto the receiver for and during the term of the receivership.

"III. The receiver shall be entitled to receive and keep for his own use as such receiver all charges and tolls arising from the use and operation of the Belt Company's railway by the receiver. It is understood that the Belt Railway is to be operated and conducted by the receiver as an extension of the lines of railway of the Missouri, Kansas & Texas Railway Company, and that the charges and tolls collected will be such as would have been collected for the service, had that company originally owned the leased property from its present freight terminal yards in Oklahoma City to the entrance to the Stockyards District. In other words, this contract contemplates the extension of the line of railway of the Missouri, Kansas & Texas Railway Company from its present yards in Oklahoma City to the entrance of the Stockyards District and there making connection with the Oklahoma Junction road. It is understood that the rate per car for switching live stock and other freight, as prescribed by the Oklahoma Corporation Commission, between points on the Oklahoma Junction road and lines connecting with the Missouri, Kansas & Texas, shall not be increased by reason of the lease and operation of the said Belt Railway by the receiver. The Missouri, Kansas & Texas especially agrees on live stock it will not charge as an intermediate carrier more than one dollar ($1) per loaded car switching.

"IV. As rental for the railway of the Belt Company as herein described, together with any additional tracks that may hereafter be constructed in connection therewith, the receiver agrees to pay the Belt Company the sum of seven thousand five hundred dollars ($7,500) per annum, payable in equal monthly installments of six hundred and twenty-five dollars ($625.00) each on or before the 15th day of each month, payments to begin upon the completion of the railway of the Belt Company and the beginning of operation thereof by the receiver as leases hereunder.

"V. During the life of this lease the receiver agrees, at his sole cost and expense, to maintain the railway of the Belt Company to conform to standards for other lines of railway operated and similarly situated, to pay such taxes as may lawfully be levied thereon during the term of this agreement, and to furnish sufficient motive power to move and handle all traffic offered to and from such Stockyards District of Oklahoma City, and to and from all other industries and connecting lines in Oklahoma City, with promptness and dispatch. The receiver shall be responsible to any and all parties for all loss and damage of whatever nature arising from his operation or control of the property hereby leased, and at the termination of this agreement shall turn the property back to the Belt Company in as good condition as when received, ordinary wear and tear excepted.

"VI. All necessary additions and betterments as to the property of the Belt Company shall be made by the Belt Company as its expense, or by the receiver

with the approval and at the expense of the Belt Company. All industrial extensions will be operated by the receiver as an extension of the present lines of railway. The Belt Company will, from time to time, authorize the receiver to construct at the expense of the Belt Company all necessary extensions and tracks to such industries as may be located along the line of railway of the Belt Company and as may be requested by the receiver: Provided, always, that if in the opinion of the Belt Company such industrial tracks are not essential to the proper development of its railway, the receiver may construct the same if located south of the Frisco railroad, and at the termination of this lease the Belt Company will pay the receiver the value of such industrial tracks and construction as of the time of taking them over. If the companies parties hereto cannot agree as to the value of such industrial tracks, the same shall be determined by arbitration as hereinafter provided.

"VII. During the life of this lease, the receiver will use his efforts to bring about the establishment of industries adjacent to the line of railway of the Belt Company.

"VIII. Upon the expiration of this lease, the Missouri, Kansas & Texas Railway Company, or any successor company which may purchase or operate its lines of railway after the termination of the present receivership, shall have the right, at its option, to. adopt and to continue this lease in effect for a period equaling, together with the period leased by the receiver, ten (10) years from the date of this contract, and thereafter subject to termination on one year's written notice by either party thereafter given to the other of its desire and intention to terminate the same upon the expiration of such notice.

"If the Missouri, Kansas & Texas Railway Company, or any such successor company, shall adopt and elect to continue this contract, as aforesaid, then upon the expiration thereof, by limitation or by notice, said Missouri, Kansas & Texas Railway Company, or any such successor company, shall, at its option, have the right for a further period of ten (10) years from and after such termination, by limitation or otherwise, to switch, receive, and deliver cars and freight to and from any industry which may hereafter be located upon or along the line of the Belt Company south of the St. Louis & San Francisco Railroad, upon payment to the Belt Company, or its assigns, of a trackage charge of one dollar ($1.00) loaded car. It is understood, however, that this agreement by the Belt Company, granting the right to the Missouri, Kansas & Texas Railway Company, or such successor company, to enjoy such trackage, is granted only on condition that said Missouri, Kansas & Texas Railway Company, or such successor company, elects to and does adopt this lease as hereinbefore provided; but if this lease should be canceled under any circumstances whereby the term of operation of the Belt property by the receiver and the Missouri, Kansas & Texas Railway Company, or such successor company, would be less than ten (10) years, this trackage agreement shall be null and void, it being understood that the trackage agreement is to be operated only after the ten (10) year period has elapsed, or the agreement is canceled after such ten (10) year period by notice as herein provided, thereby protecting the Missouri, Kansas & Texas Railway Company, or such successor company, with ten (10) years' additional right to reach any industries, on a trackage basis, that may be located on the tracks of the Belt Company. It is understood, however, that if, from any cause, this lease shall be terminated prior to the expiration of ten (10) year term, and such cancellation is contrary to the desire of the Missouri, Kansas & Texas Railway Company, or such successor company, it may exercise the trackage right hereby granted for ten (10) years from the date of cancellation.

"It is further understood that during the period in which the Missouri, Kansas & Texas Railway Company, or such successor company, may enjoy the trackage arrangement of one dollar ($1.00) per loaded car over the Belt Railroad tracks to and from industries referred to hereinbefore, the said Missouri, Kansas & Texas Railway Company, or such successor company, will, during such period, apply the same rates on such traffic moving via said Missouri, Kansas & Texas Railway Company, or such successor company, from and to such industries, as apply from or to industries located on their own line, or as applied to their local freight terminal at Oklahoma City; the receiver of the Missouri, Kansas & Texas Railway having the option to give up the trackage

arrangement whenever they cease to apply the Oklahoma City rates to and from industries located on the Belt Railroad Company's tracks hereinbefore referred to.

"Nothing in this contract shall be so construed as authorizing the construction or extension of any railway connecting any industrial track or tracks of the Belt Company with any railway other than that of the Missouri, Kansas & Texas Railway Company, without specific consent in writing first had and obtained from the Belt Company.

"IX. This contract and lease is subject to all existing future federal and state laws, and to all rules and orders of any court, commission, or body having common authority to regulate either of the parties hereto or the matter covered by this contract. In case it should be found to conflict with any law, rule, or order valid against it, or in case of substantial impairment of the benefits to either party herein contemplated by reason of any such law or rule or order, to such extent that this contract become unremunerative or burdensome, the terms thereof shall be modified to meet such conditions.

"X. This contract and lease is not transferable without the written consent of the Belt Company, and no trackage rights or other operating rights shall be granted by the receiver to any other companies over the tracks covered by this contract and lease without the consent of the Belt Company.

"XI. In the event of any dispute arising under the provisions of this contract, or as to the proper construction of any clause of same, or any modification thereof as provided in article IX thereof, then the matter in dispute shall be submitted to arbitration, one arbitrator to be selected by each of the parties hereto and a third arbitrator by the two so chosen, and the decision of any two of them shall be binding and conclusive upon the parties hereto.

"XII. This contract is made subject to the approval of the Corporation Commission of Oklahoma.

"In witness whereof, the parties hereto have signed this contract in duplicate, the day and year first above written, by their officers thereunto duly authorized.

"Executed in duplicate.     Oklahoma Belt Railroad Company,
               "By Norman G. Collins, Its President.
          "Charles E. Schaff,
          "As Receiver of the Missouri, Kansas & Texas Railway.
"Attest: T. P. Martin, Jr., Secretary.
     "CH WAW
"Approved as to form: Joseph M. Bryson."

[1] The only question involved is whether, under the original contract and the later contract between the parties, the Belt Railroad was to pay for the transportation by the receiver of chats for the ballasting of its track, the tariff rates filed with the Interstate Commerce Commission, or the actual cost of transportation as provided by the contract made by Leon F. Lonnbladh, chief engineer of the plaintiff, and C. E. Smith, chief engineer of the defendant, which was approved by the chief operating officer of the plaintiff, whose duties, the agreed statement of facts recites, were substantially the same as the duties of a general manager of a railroad not in the hands of a receiver.

The agreed statement of facts also states that the chief engineer of the plaintiff stated to the chief engineer of the defendant that, "inasmuch as the plaintiff was under contract to operate and maintain the road being built for a period of ten years, the expense of maintenance and operation would be greatly reduced if the road was ballasted," and thereupon the following agreement was made:

"That the plaintiff was to deliver chats for the ballasting of said road on the road at Oklahoma City, and the defendant agreed to pay an amount for

said ballast not to exceed 60 cents per cubic yard, the exact amount to be ascertained based upon the cost of chats at the mines and the cost of transporting same to Oklahoma City in work trains on a work train basis as determined by the plaintiff."

After the ballasting had been completed, the plaintiff rendered a statement to the defendant, in accordance with this second contract, based upon 10 cents per cubic yard, and the actual work train cost of transportation, which was duly paid by the defendant. It was also agreed that, if this contract as to the cost of transportation was void, the plaintiff would be entitled under the tariff filed by it with the Interstate Commerce Commission to the sum of $9,403.93, in addition to the amount paid by the defendant. The court rendered judgment in favor of the plaintiff for the sum demanded, with interest thereon.

Under the original contract between the parties the plaintiff was to have the exclusive use of the Belt Railroad, was to maintain it to conform to standards for other lines of railway similarly situated, to pay all taxes lawfully levied thereon during the term of the agreement, and be responsible to any and all parties for loss and damage arising from the operation of the property leased to it, and at the expiration of the lease turn the property back in as good condition as it was when received, ordinary wear and tear excepted; that the lease was to be in effect while the receivership of the plaintiff continued, but the Missouri, Kansas & Texas Railway, of which the plaintiff was receiver, or any successor company which may purchase or operate its lines of railway after the determination of the receivership, shall have the right at its option to continue this lease in effect for the period of ten years from the date of the contract, and thereafter subject to termination on one year's written notice by either party. It also provided that, if there is a cancellation after the ten-year period, the Missouri, Kansas & Texas Railway, or its successor, shall at its option have a right to a further period of ten years to switch, receive, and deliver cars and freight to and from any industry which may hereafter be located upon or along the line of the Belt Company, south of the St. Louis & San Francisco Railroad, upon the payment to the Belt Company of a trackage charge of $1 per loaded car.

The learned trial judge, in a memorandum opinion, held that, while the plaintiff would reap an advantage from the use of the ballast, it would only be temporary, and that the real beneficiary was the defendant, and therefore, under the Interstate Commerce Act (Comp. St. § 8563 et seq.), the plaintiff could make no contract for transportation at a less rate than that in the tariff schedules filed with the Interstate Commerce Commission. That if, by mistake or contract, a carrier in interstate transportation charges less than the filed tariff rate, it not only may recover the difference, but it is its duty to do so, or else it violates the law, is beyond question. Nor does it matter if the carrier is benefited to some extent by the lower rate, unless it is connected with its duties as a carrier, and not in the field of some other business. New York, New Haven & Hartford R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515; Montgomery v. Chicago, Burlington & Quincy R. Co., 228 Fed. 616, 143 C. C. A. 138, decided by this court.

So the question is narrowed down to whether the contract was made for the benefit of the plaintiff in its business as a carrier. The rental in the original contract was evidently based upon the cost under that contract, and when the contract for the ballasting was made no extra rental charge was made on that account. That it was intended primarily, if not altogether, for the benefit of the plaintiff, is shown by the agreed statement of facts, when the chief engineer of the plaintiff stated to the chief engineer of the defendant, that "inasmuch as the plaintiff was under contract to operate and maintain the road being built for a period of ten years, the expense of maintenance and operation would be greatly reduced if the road was ballasted." That was one of the considerations, if not the sole consideration, of the agreement to transport the ballasting material at actual cost. It was therefore for the benefit of plaintiff in its business as a carrier, and not for any collateral benefit, unconnected with the operation of the railway.

In Santa Fé, P. & P. Railroad v. Grant Bros., 228 U. S. 177, 185, 186, 33 Sup. Ct. 474, 477 (57 L. Ed. 787), it was held:

"It is apparent that there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation. * * * In constructing, improving, or repairing its road, and in building its extensions and branches, the railroad company is providing facilities for its service as a common carrier, but of course is not acting as such. It may do the work itself, if it chooses, or it may make it the subject of contract with another. In the latter case it simply employs an appropriate agency. The haulage by the railroad company of the men, appliances, and supplies, required by the contractor for the purpose of the construction or improvement, to or from the point on its line where the work is to be done, is merely incidental to the work itself. The cost of such haulage is obviously an item of expense which must be taken into account in fixing the terms of the construction contract, and in providing for it over its own line the railroad company may adjust the matter with the contractor as it sees fit."

In the instant case the ballast waas solely for the benefit of the plaintiff, as stated by its chief engineer. While it is true that upon the expiration of the lease the defendant would receive the benefit of the ballast, it had paid the cost of it as provided in the contract, without receiving any additional compensation for the increased cost paid by it for the construction of the road.

In Montgomery v. Chicago, Burlington & Quincy Railroad Co., supra, this court said:

"It may be freely conceded that, in the present state of the law, a common carrier has no right to enter the field of general business and transport the articles and commodities used and sold therein at less than the regular published rates available to the general public. It has the right to provide eating houses for its passengers and employees at points on its line, and may transport the articles and commodities for the use of such eating houses at less than the full published rate."

New York, New Haven & Hartford Railroad Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515, relied on by counsel for plaintiff is based upon a state of facts which makes it inapplicable to the instant case. In that case the

Chesapeake & Ohio Railroad Company made an agreement to sell to the New Haven Railroad 60,000 tons of coal at $2.75 per ton for delivery in Connecticut from the Kanawha district in Virginia. This price was only 28 cents a ton for carrying the coal from the Kanawha district to Newport News, as the coal and the cost of transportation from Newport News to Connecticut would aggregate $2.47 per ton, while the published tariff rate for like carriage from the same district was $1.45 per ton. This was clearly a violation of the Interstate Commerce Law, as the reduced rate was not in consideration of any benefit to accrue in the operation of the road.

There can be no doubt that, if the contract for ballasting the road had been inserted in the original contract, it would have been valid, and plaintiff would not be entitled to recover the tariff rates. Then why could it not be made at a later day?

[2] It is also urged by the plaintiff that the second contract, not having been approved by the receiver, it is not binding; but there is no merit in this contention. Northern Pacific Railroad Co. v. American Trading Co., 195 U. S. 439, 461, 25 Sup. Ct. 84, 49 L. Ed. 269.

The judgment is reversed, with directions to enter judgment for the defendant.

STONE, Circuit Judge (dissenting). I am compelled to dissent for the following reasons:

The law is that an interstate common carrier, when acting as a common carrier, is not permitted, through contract or otherwise, to depart from its lawfully established tariffs. L. & N. R. Co. v. Maxwell, 237 U. S. 94, 35 Sup. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665, and citations therein. This rule is so strictly interpreted that the carrier cannot, as a common carrier, transport even its own property. As where a railway owning mines and selling coal undertook to transport that coal and deliver it to a purchaser at less than the cost of the coal plus delivering and tariff transportation charges. New York, N. H. & H. R. Co. v. I. C. C., 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515. Nor can there be such a departure based on some benefit therein to the carrier, such as increased traffic. New York, N. H. & H. R. Co. v. I. C. C., supra, 200 U. S. at page 397, 26 Sup. Ct. 272, 50 L. Ed. 515.

The only instance in which such a carrier is permitted to depart from its tariffs, and carry persons or freight for less than the tariffs, or even for nothing, is where the carriage is for the sole benefit of the carrier, with no resulting benefit or injury direct or incidental to another person. In such carriage the carrier is regarded as not acting as a "common carrier." The definition and confines of this departure rule are stated in Santa Fé, P. & P. R. Co. v. Grant Bros., 228 U. S. 177, at page 186, 33 Sup. Ct. 474, at page 477 (57 L. Ed. 787), where the court says:

"In constructing, improving, or repairing its road, and in building its extensions and branches, the railroad company is providing facilities for its service as a common carrier, but, of course, is not acting as such. It may do the work itself, if it chooses, or it may make it the subject of contract with another. In the latter case it simply employs an appropriate agency. The

haulage by the railroad company of the men, appliances, and supplies, required by the contractor for the purpose of the construction or improvement, to or from the point on its line where the work is to be done, is merely incidental to the work itself. The cost of such haulage is obviously an item of expense which must be taken into account in fixing the terms of the construction contract, and in providing for it over its own line the railroad company may adjust the matter with the contractor as it sees fit. If the railroad company did the work directly, it would have to take its employees and the necessary outfit to the place of work, and it may undertake to do the like for the contractor, either free of charge or at reduced rates, as they may agree."

And at page 188 of 228 U. S. (33 Sup. Ct. 478, 57 L. Ed. 787):

"It is clear that in dealing with transportation of this character over its own road, in connection with construction or improvement, a railroad company is not acting in the performance of its duty as a common carrier, and the arrangement for free or reduced rate carriage for the necessary materials and men used in the work, when it is a part of the contract, entered into in good faith and not as a subterfuge, is not obnoxious to the provisions of law prohibiting departures from the published tariffs, for the reason that such an agreement lies outside the policy of these provisions. See Matter of Railroad-Telegraph Contracts, 12 I. C. C. Rep. 10, 11."

The same limitations are suggested in a case in this circuit (Montgomery v. C., B. & Q. R. Co., 228 Fed. 616, 143 C. C. A. 138) which involved the right of a railway company to maintain an eating house on its line, to which it carried, free of freight, the food and other supplies. This court there said:

"It is conceded in the petition that it is lawful for defendant to ship, free of charge, such supplies, articles, or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

The facts show that the carrier was here selling mine products, chats, to the Belt, and delivering them to it, after an interstate carriage, for use in ballasting the roadbed of the Belt. If these were all of the facts, there could be no question of the application of the tariff rate, because the carriage would be as a common carrier for the benefit of the Belt. It would make no difference that the Belt was or was not obligated to so ballast its line under the original contract, or that the new contract was at the request of the receiver, because such circumstances would in no wise affect the character of the carriage, which is the test. But the agreed statement of facts contains statements that this ballast "inured to the benefit of the plaintiff [receiver] in reduced operating expense," and that the ballast was put in "for the benefit of the plaintiff." Since the receiver was obligated, under the lease, to maintain the line during the lease term, and was to operate over the line, it is clear that the above statements show a benefit accruing to the carrier, other than the freight charges, from the transportation. But the carrier does not lose its character as a common carrier because it receives from the transportation benefits or gains in addition to the freight charge. It must receive the entire substantial benefit. In short, the transportation must be, in substance, entirely for its own use, in the conduct of its business as a common carrier, before it can ignore the tariff rates. No part of the agreed statement of facts undertakes to allege that the receiver would receive the sole substantial benefit from this ballasting. In fact, such a statement seems to have

been carefully avoided. The nearest approach thereto is a statement that the lease is for a term of ten years. This statement is insufficient for two reasons:

First, the lease (set forth in the evidence) is not for ten years and no agreed statement of the parties to the contrary can affect this court, because the issue here is one of concern, not only to the parties to this action, but to the public. The lease is for the duration of the receivership, which is entirely uncertain. The contract then provides that:

"Upon the expiration of this lease, the Missouri, Kansas & Texas Railway Company, or any successor company which may purchase or operate its lines of railway after the termination of the present receivership, shall have the right, at its option, to adopt and continue this lease in effect for a period equaling, together with the period leased by the receiver, ten (10) years from the date of this contract, and thereafter subject to termination on one year's written notice by either party thereafter given to the other of its desire and intention to terminate the same upon the expiration of such notice."

Second, we are nowhere informed as to the life of such ballasting. So far as we are advised, it may be as good at the end of the lease as at any time during the lease. In short, the Belt may, at the end of the lease, receive back its line well ballasted with chats, which would be a distinct addition to the value of its property. Again, the requirement of the contract that the property, which consisted entirely of trackage, should be "maintained" by the lessee during the lease and turned back to the Belt "in as good condition as when received, ordinary wear and tear excepted," requires that this ballasting, constituting a part of the leased property, should be kept up during the lease. I think the Belt has not only failed to sustain the burden of showing that the transportation of the chats was solely for the benefit of the receiver, but that the facts show clearly that a substantial benefit would accrue to the Belt.

I think the judgment should be affirmed.