## SANTA FE, PRESCOTT & PHŒNIX RAILWAY COMPANY v. GRANT BROTHERS CONSTRUCTION COMPANY.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 147.   Argued January 24, 1913.—Decided April 7, 1913.

A rule of law restricting the right of contract which rests on principles of public policy, because of the public ends to be achieved, extends no further than the reason for it and does not apply to contracts wholly outside of and not affecting those ends.

The rule that common carriers cannot secure immunity from liability for their own negligence has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such a case the ordinary rules of law relating to contracts control.

A contract made by a railroad company for construction work is one made outside of the performance of its duty as a common carrier, and a stipulation that the contractor, in consideration of lawfully reduced rates for transportation of supplies and employés, will assume all risk of damage of any kind even if occasioned by the company's negligence, is not void as against public policy. *Balt. & Ohio Ry. Co.* v. *Voight,* 176 U. S. 498, followed; *Railroad Co.* v. *Lockwood,* 17 Wall. 357, distinguished.

In dealing with transportation of supplies and employés of contractors in connection with construction and improvement of its own road, a railroad company does not act as a common carrier; arrangements made in good faith with such contractors for free or reduced rates are not violations of the prohibitions of the Interstate Commerce Act against rebates.   See *Matter of Railroad-Telegraph Contracts,* 12 I. C. C. Rep. 10.

Where no rule of public policy denies effect to stipulations in a contract, the highest public policy is found in enforcing the contract as actually made.

Courts are not at liberty to revise contracts.   They can only determine what the parties meant by the terms and expressions as used.

In this case *held* that expressions to effect that the contractor assumed "all risk and damage" and the railroad company assumed "no obligation or risk" in a contract between a railroad company and

contractor for construction of roadbed and not in connection with duties as a common carrier, included damage caused by the company's own negligence.

*Quære* to what extent a contractor can by a stipulation, valid as to himself and in consideration of reduced rates of transportation, exempt a railroad company from liability to his employés for damages sustained by them from negligence of the railroad company while transporting them.

13 Arizona, 186, reversed.

THE facts, which involve the construction of a contract between a railway company and a construction contractor and the liability of the former for materials belonging to the latter destroyed by fire, are stated in the opinion.

*Mr. Gardiner Lathrop*, with whom *Mr. Robert Dunlap* and *Mr. Paul Burks* were on the brief, for plaintiffs in error.

*Mr. Isidore B. Dockweiler*, with whom *Mr. A. C. Baker* was on the brief, for defendant in error:

The railroad company was a common carrier of the goods destroyed, and hence, could not by contract absolve itself from liability to the defendant in error for its acts of negligence.

For the true test to determine whether a party is a common carrier, see 1 Hutchinson on Carriers, § 48, 3d ed.; all the elements of which test are found and fully satisfied in the case at bar.

Plaintiff in error undertook to carry goods of the kind destroyed, to wit, miscellaneous merchandise, such as railroads usually carry, and for which it had an established tariff rate,by the methods by which its business was conducted and over its established road.

The transportation was for hire, for the established tariff rate of "one cent per mile per ton" as set forth in the agreement.

Plaintiff in error owed an actionable duty to the defendant in error to transport the latter's goods of the class and kind destroyed.

The plaintiff in error being a common carrier with respect to the goods shipped by defendant in error, then, though the carriage was by special contract, it still remained a common carrier. *Railroad Co.* v. *Lockwood,* 17 Wall. 376; *Liverpool &c. St. Co.* v. *Phœnix Ins. Co.,* 129 U. S. 397; *Mears* v. *N. Y., N. H. & H. R. Co.,* 75 Connecticut, 171.

Plaintiff in error having no right to refuse to carry the goods of defendant in error, could not contract for their carriage in any capacity except as a common carrier. *Liverpool & G. W. S. Co.* v. *Phœnix Ins. Co.,* 129 U. S. 397; 4 Elliott on Railroads, pp. 11, 12; 1 Hutchinson on Carriers, § 44; *C. W. & St. L. R. Co.* v. *Wallace,* 66 Fed. Rep. 506.

The fact that the contract of carriage of the destroyed goods of the contractor was incidental to a contract having for its principal object the construction of a subsidiary line of plaintiff in error cannot change the character of plaintiff in error to that of a private carrier.

Being a common carrier, plaintiff in error could not by contract absolve itself from liability to the shipper for its acts of negligence. *B. & O. S. W. Ry. Co.* v. *Voigt,* 176 U. S. 498; *The Kensington,* 183 U. S. 263.

To hold the railroad company as a common carrier does not render the contract violative of the Interstate Commerce Law.

The Interstate Commerce Commission has construed the statute as not preventing "a common carrier from giving free or reduced rate carriage over its lines to contractors for materials, supplies and men. 12 I. C. C. Rep. 11.

The object of the statute is "to secure just and reasonable charges for transportation," and "to prevent unjust

discrimination in the rendition of services under similar conditions."

The case at bar is an action *ex delicto* and not *ex contractu.*

The contract of carriage did not in terms exempt the railroad company from liability for its acts of negligence, and, therefore, the exemption contracted for was from loss occasioned by the dangers naturally incident to the carriage, and not from damage brought about by the carrier's negligence. *N. J. St. N. Co.* v. *Bank,* 6 How. 344; *Maynard* v. *Syracuse Ry. Co.,* 71 N. Y. 183; 4 Elliott on Railroads, § 1508; 1 Hutchinson on Carriers, § 463 (3d ed.); Monographic Note, 88 Am. St. Rep. 68, p. 119.  ·

The determination of the question of negligence was properly submitted to the jury.

Neither the question of negligence, nor the question whether such negligence was the proximate cause of the loss, properly arises upon this appeal. Those were finally settled below.

The facts of the case being such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter was for the jury, and their verdict will not be disturbed on appeal. *Grand Trunk Ry.* v. *Ives,* 144 U. S. 408; 21 Enc. Law, 498; *Marande* v. *Tex. & Pac. Ry. Co.,* 184 U. S. 173.

The negligence being found, the commission and omission of acts exposing the goods of the contractor to dangers of destruction or loss and failure to safeguard the same from injury, the question of proximate cause became one of fact for the jury, and no independent, intermediate efficient cause appearing, the original wrong must be considered as reaching to the effect and proximate to it. *Mil. & St. P. R. Co.* v. *Kellogg,* 94 U. S. 470; *Aetna Ins. Co.* v. *Boon,* 95 U. S. 117; *Hays* v. *Mich. Cen. R. Co.,* 111 U. S. 228; *The G. B. Booth,* 171 U. S. 450; *Hays* v. *Williams,*

17 Colorado, 472; *Pullman P. C. Co.* v. *Laack*, 143 Illinois, 260.

MR. JUSTICE HUGHES delivered the opinion of the court.

The Grant Brothers Construction Company recovered judgment in the District Court of the Territory of Arizona for $9,061 for the loss of its property by fire on June 6, 1907, between Bouse and Phœnix, Arizona, while in course of transportation on the railroad operated by the Santa Fe, Prescott & Phœnix Railway Company, the plaintiff in error. The judgment was entered upon a verdict of a jury, a motion for a new trial was denied, and the judgment was affirmed by the Supreme Court of the Territory, 13 Arizona, 186.

The Railway Company had been engaged in building, westerly from its main line, a branch railroad known as the Arizona and California Railroad. For this purpose it entered into a contract with the Construction Company for the necessary grading. The property in question consisted of the camp and grading outfit, and supplies, belonging to the Construction Company, which had been used by it in this work, and was being removed by reason of its completion. At the time in question the branch line was operated regularly only as far as Bouse and the property was loaded on cars "at the front" or end of track, about twelve miles west of that station, to be carried to Phœnix. The superintendent, foremen and about fifty workmen of the Construction Company were taken on the cars at the same place for the same destination.

The cars were hauled by the Railway Company to Bouse (where explosives and hay were unloaded), and were there attached to a regular train which brought them to a point known as the A. and C. Junction, where the Arizona and California line joined the main line of the

Railway Company.  At this junction (which was about
four miles from Wickenburg, a station on the main line
in the direction of Phœnix) all the cars containing the
outfit of the Construction Company, save one, were cut
out of the train and were put upon a side-track.  The
rest of the train, with the employés of the Construction
Company, went on to Wickenburg.  This took place late
in the evening of June 5, 1907, and about ten o'clock in the
morning of the next day, four of the cars left on the side-
track were destroyed by fire.

The A. and C. Junction is described as being in an open
desert, without a station agent or inhabitants, and with-
out water or fire apparatus.  The cars were left without a
watchman in charge.  The reason given by the conductor
for leaving them at this point was that there was no room
for the cars at Wickenburg.  There was no explanation of
the cause of the fire, the only suggestion, as to this, being
that before the fire occurred one train passed by, between
four and five o'clock in the morning.

At the close of the evidence the Railway Company
requested the trial court to direct a verdict in its favor.
This request was refused and exception taken; and the
sustaining of this ruling is assigned as error.  It is con-
tended by the Railway Company that, under its contract
with the Construction Company, it was exempt from all
liability and, further, that even assuming it to be liable
for negligence there was a total failure of proof in that
respect.

The principal question relates to the scope and validity
of the provision of the contract between the parties as to
the liability of the Railway Company.

The facts are these: In November, 1904, the Railway
Company issued a call for proposals for the grading of the
roadbed, clearing right-of-way, making necessary canals,
etc., of the Arizona & California Railroad, for a distance
of about forty miles.  The Construction Company made a

bid, which was accepted, and a contract was executed accordingly on December 12, 1904.

This contract, after providing for the performance of the described work of grading, etc., contained the following terms with respect to the transportation of supplies, camp and grading outfit and employés of the Construction Company, which were the same as those set forth in the call for bids:

"14. Water will be delivered in cars at the end of the track at the rate of One Dollar and Fifty Cents ($1.50) per 1000 gallons and supplies will be hauled to End of Track, both in the usual manner of construction trains, subject to delays, etc., incident thereto. All risk of loss or damage to be borne by the Contractor.

"15. The Company will furnish a rate of one cent per ton mile from all points on the S. F. P. & P. Road and leased roads for the Contractor, on Camp and Grading Outfit and supplies, corral supplies, etc., except explosives and commissary goods, and return to original shipping points at same rates, on completion of the work. All movements of goods at less than tariff rates to be at consignee's risk of loss and damage.

"16. The Company will also furnish the Contractor's employés . . . a rate of one cent per passenger mile, . . . and return those who have worked until the completion of contract at the same rate. Passengers carried at less than tariff rates will be required to assume all risk of accidents to person and baggage. The plan of movement of these employés and freight is to be according to rules of the General Freight and Passenger Agent.

"17. The Company will also secure for the Contractor similar rates over the Santa Fe Company's Coast Lines, on Camp and Grading Outfit, in carload lots, both to and from the work, and for workmen going to the work in lots of five (5) or more."

After the work covered by this contract had been finished it was agreed that the Construction Company should continue the grading of the road further to the west, upon the same terms and conditions as those stated in the former contract, save that the prices for the work were increased, and it was provided that water should be delivered at the end of track free of cost, except for car-hire, and that men and supplies should be hauled free on the line of the Arizona & California Railroad, between the A. and C. Junction and the end of track. This supplementary agreement, which was evidenced by letters exchanged in November, 1905, also contained an express provision "that the company shall assume no obligation or risk in case of accident or damage to men and supplies."

It was under these conditions that in June, 1907, the Railroad Company,—the grading having been done—took up the men, outfit and supplies of the Construction Company at the end of the track for the purpose of transporting them to Phœnix.

It is alleged in the complaint that the transportation of the property was to be at the contract rate of one cent per ton mile and it is undisputed that this was less than the tariff rates of the Railway Company accorded to the general public.

It is the established doctrine of this court that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation. *Railroad Company* v. *Lockwood,* 17 Wall. 357; *Liverpool Steam Co.* v. *Phenix Insurance Co.,* 129 U. S. 397; *Baltimore & Ohio &c. Railway Co.* v. *Voigt,* 176 U. S. 498, 507; *Knott* v. *Botany Mills,* 179 U. S. 69, 71; *The Kensington,* 183 U. S. 263, 268. The rule rests on broad grounds of public policy justifying the restriction of liberty of contract because of the public ends to be achieved. The great object of the law governing common carriers was to secure the utmost care in the rendering of a service of the highest importance to the

community. A carrier who stipulates not to be bound to the exercise of care and diligence "seeks to put off the *essential duties* of his employment." It is recognized that the carrier and the individual customer are not on an equal footing. "The latter cannot afford to higgle or stand out and seek redress in the courts. . . . He prefers, rather, to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this, or abandon his business." *Railroad Company* v. *Lockwood, supra,* pp. 378, 379. For these reasons, the common carrier in the prosecution of its business as such is not permitted to drop its character and transmute itself by contract into a mere bailee with right to stipulate against the consequences of its negligence.

Manifestly, this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such case, it is dealing with matters involving ordinary considerations of contractual relation; those who choose to enter into engagements with it are not at a disadvantage; and its stipulations even against liability for its own neglect are not repugnant to the requirements of its public service. The rule extends no further than the reason for it. It is apparent that there may be special engagements which are not embraced within its duty as a common carrier although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation. *Baltimore & Ohio &c. Railway Co.* v. *Voigt,* 176 U. S. 498, and cases cited; *Northern Pacific Railway Co.* v. *Adams,* 192 U. S. 440; *Long* v. *Lehigh Valley R. R. Co.,* C. C. A., 2d Circuit, 130 Fed. Rep. 870.

Thus in *Baltimore & Ohio &c. Railway Co.* v. *Voigt, supra,* it was held that an express messenger in charge of

express matter in pursuance of the contract between the express company and the railroad company was not a passenger of the latter within the meaning of the rule of *Railroad Company* v. *Lockwood, supra;* that he was not constrained to enter into the contract whereby the railroad company was exonerated from liability to him for its negligence; and that such a contract did not contravene public policy. His position was one "created by an agreement between the express company and the railroad company, adjusting the terms of a joint business—the transportation and delivery of express matter. His duties of personal control and custody of the goods and packages, if not performed by an express messenger, would have to be performed by one in the immediate service of the railroad company." It was clear that although the messenger was actually carried on the train, and although the railroad company received compensation in connection with its contract for the express business, his relation to the railroad company was "widely different from that of ordinary passengers," and there was no justification for extending the doctrine restricting the freedom of contract to a case which lay entirely outside the reason which supported it.

In constructing, improving or repairing its road, and in building its extensions and branches, the railroad company is providing facilities for its service as a common carrier, but of course is not acting as such. It may do the work itself, if it chooses, or it may make it the subject of contract with another. In the latter case it simply employs an appropriate agency. The haulage by the railroad company of the men, appliances and supplies, required by the contractor for the purpose of the construction or improvement, to or from the point on its line where the work is to be done, is merely incidental to the work itself. The cost of such haulage is obviously an item of expense which must be taken into account in fixing the

terms of the construction contract, and in providing for it over its own line the railroad company may adjust the matter with the contractor as it sees fit.  If the railroad company did the work directly it would have to take its employés and the necessary outfit to the place of work, and it may undertake to do the like for the contractor, either free of charge or at reduced rates, as they may agree.

Usually, necessity or proper convenience requires an undertaking by the railroad company, as to such transportation, which it would be under no obligation to assume in any event as a common carrier.  Men and supplies must be put down and taken up at points on the line where there is no regular station and where the railroad company would not be bound to accept or to discharge freight or passengers.  In a case, like the present one, of the grading of an extension or branch line, it is convenient that the track, laid as the roadbed is prepared for it, should be utilized for the hauling of men and materials to a point as near as possible to the work, although such track is not open to the public and the railroad company as a common carrier has assumed, as yet, no obligation for general transportation over it.  This was obviously contemplated in the contract in question; and a construction of the contract, so as to make it apply only to the hauling of camp and grading outfit to stations to which the company was regularly doing business, is wholly inadmissible.  The original proposals stated that the Railway Company hoped "to keep the end of the track within four miles of the nearest grading camp."  The contract itself provided that water and supplies should "be hauled to end of track, both in the usual manner of construction trains."  And, after providing for the reduced rates for outfit, supplies and employés from all points on the line of the Railway Company and for the return of the same to original shipping points at the same rates on completion of the work, the intent is shown by the pro-

vision immediately following that the Railway Company should secure similar rates for the contractor over its coast lines "on camp and grading outfit, in carload lots, *both to and from the work*." In the supplementary contract it was provided that men and supplies should be hauled "to the end of track free," with the provision that this should only apply on the line of the Arizona and California Railroad, that is, "between A. and C. Junction and the end of the track." When the work was done, the men and outfit were actually taken up by the Railway Company some twelve miles beyond the last regular station on the branch line. The parties plainly intended that the camp and grading outfit should be transported for the benefit of the contractor as near to the work as it reasonably could be, and without regard to regular stations, and that it should be removed in the same way when the grading was completed.

It is clear that in dealing with transportation of this character over its own road, in connection with construction or improvement, a railroad company is not acting in the performance of its duty as a common carrier, and the arrangement for free or reduced-rate carriage for the necessary materials and men used in the work, when it is a part of the contract, entered into in good faith and not as a subterfuge, is not obnoxious to the provisions of law prohibiting departures from the published tariffs, for the reason that such an agreement lies outside the policy of these provisions. See *Matter of Railroad-Telegraph Contracts*, 12 I. C. C. Rep. 10, 11.

The parties then were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies effect to their expressed intention, but on the contrary as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made. Undoubtedly, it

is not to be lightly concluded that the Railway Company has been relieved from liability for its neglect, but on the other hand, if this was the agreement as fairly interpreted, it is not to be arbitrarily overridden. The parties were on an equal footing. The risk of loss or damage to the grading outfit or supplies from any cause while being transported over the line of the Railway Company, could be assumed by one party or the other as they saw fit. This risk was an item which naturally would enter into the calculations of the parties with respect to the rate to be charged by the Railway Company. We are not at liberty to revise the contract, and the question simply is whether the stipulation against liability in view of the reduced rates covered all losses, those which might be due to the carrier's neglect as well as others.

We entertain no doubt as to what the parties meant. The limitations upon the liability of the Railway Company were first fully stated in the call for proposals and when the bid was accepted in accordance with the terms of the call, the same limitations were inserted in the contract. Thus, it was provided with respect to the supplies to be hauled to the end of track, "All risk of loss or damage to be borne by the Contractor;" again, as to the camp and grading outfits and supplies; "All movements of goods at less than tariff rates to be at consignee's risk of loss and damage;" and with regard to the employés; "Passengers carried at less than tariff rates will be required to assume all risk of accident to person and baggage." Further, in the supplemental agreement, it was stipulated: "the Company shall assume no obligation or risk in case of accident or damage to men and supplies." When we consider the circumstances of the parties and the objects of the contract, we cannot escape the conclusion that these reiterated statements evidence the intention to deal comprehensively with *all* the risks incident to the transportation, not excluding the obvious risk of loss by reason of some neglect in the

operation of the road. The contract was between two corporations and dealt with the familiar transactions of their everyday concerns. The stipulations are in the terse language of business men. The supplemental contract is contained in an informal letter. And, when "all risk of loss or damage" is spoken of, and it is provided that the Railway Company shall assume "no obligation or risk in case of accident or damage," it is evident that they are looking at the matter from a business standpoint and are bargaining for a reduced rate to be charged by the Railway Company on the one hand and an assumption of the entire risk of the transportation by the Construction Company on the other. It is true that general words of exemption have often been found insufficient to cover injuries due to negligence, and a rule imposing such a limitation upon their effect has manifest propriety in those jurisdictions where common carriers, acting as such, are allowed to stipulate against the consequences of their neglect if this is done in explicit terms. But here, to repeat, we are entirely out of the domain governed by the rule of public policy affecting common carriers, and the agreement must be taken according to its actual intent.

It will be observed that the limitation from liability was to apply to the workmen as well as to the goods. We do not need to inquire as to the effect of such an exemption in the case of a workman who had not assented to it. But the provisions as to the workmen throw light upon the intent of the parties with respect to the property. In the supplemental contract both men and supplies were grouped in one stipulation for immunity. The Railway Company, however, would not have been liable in any event for injuries to the workmen save in case of negligence; and in bargaining for a limitation of liability as to the workmen, they evidently had negligence in view. The word "accident" in this connection was manifestly used in its popular sense and not as limited to occurrences beyond the

carrier's control.   Further, it will be remembered, that in the supplemental contract, free haulage was given over the branch line and the stipulation, therein repeated, was certainly to protect the carrier from a liability, in the case of injury to the workmen, which otherwise would attach; that is, a liability for negligence.

This point was recognized by the court in *Railroad Company* v. *Lockwood,* 17 Wall. 357, which involved the obligation of a common carrier.   The contract for exemption from liability was general, but it related to a drover accompanying his cattle (who, notwithstanding that he had a pass, was held to be a passenger for hire) as well as to the cattle themselves; and with respect to the drover, it was assumed in the course of the opinion that the stipulation included immunity from liability for the company's negligence.   And thus the court was brought to the decision of the question whether a common carrier could be permitted to make a stipulation of that sort.   The court said: "It is strenuously insisted, however, that as negligence is the only ground of liability in the carriage of passengers, and as the contract is absolute in its terms, it must be construed to embrace negligence as well as accident, the former in reference to passengers, and both in reference to the cattle carried in the train.   As this argument seems plausible, and the exclusion of a liability embraced in the terms of exemption on the ground that it could not have been in the mind of the parties is somewhat arbitrary, we will proceed to examine the question before propounded, namely, whether common carriers may excuse themselves from liability for negligence" (*id.,* pp. 362, 363).

The question as to the fair interpretation of language such as is used in the present case, where the railroad company is acting outside the performance of its duty as a common carrier was considered by the Circuit Court of Appeals in the Second Circuit in *Long* v. *Lehigh Valley*

*R. Co.*, 130 Fed. Rep. 870. That was the case of an express
messenger who was injured while employed as such in an
express car on one of the defendant's trains, owing to the
negligence of the defendant's employés.    His contract
with the express company contained a provision that he
assumed "all risk of accidents and injuries" to himself
"arising out of such employment," and that he released
the express company and the transportation lines on which
he was to render service from any claims "arising out of
any such accidents or injuries" that might happen to him
while so employed.  Circuit Judge Wallace in delivering
the opinion of the court, after referring to *Baltimore &
Ohio &c. Ry. Co.* v. *Voigt*, 176 U. S. 498, said: "It is said
that the contract in that case in terms included among the
risks assumed by the express messenger accidents and
injuries occasioned by negligence, while the contract here
does not; and it is urged that, in the absence of such a
stipulation, the contract should be construed not to extend
to that class of accidents or injuries.  This contention
would doubtless be sound if the parties contracting had
not been treating on terms of equality, as is the case be-
tween a common carrier and a shipper of goods or a pas-
senger.   But when this is not the case, and no rule of pub-
lic policy forbids a contract by which one of the parties is
exonerated from any risk arising from negligence, there is
no reason why the ordinary rules of construction should
not obtain, and the contract be given effect according to
the intention of the parties.  The observations of this court
in *McCormick* v. *Shippy*, 124 Fed. Rep. 48, 59 C. C. A. 568,
are appropriate: 'There is no question of public policy
involved in this contract, as in the case of a common
carrier.   It is well settled that the parties in such a case
have the right to provide by apt language against liability
for negligence.   .   .   .   The clause must be interpreted
to include loss through negligence, because for loss not
arising from negligence he would not be liable.'

"So, in this case, the defendant, being merely a private carrier in respect to the plaintiff, owed him merely the duty of ordinary care, and could only have been liable to him for injuries arising from negligence, and the release made in advance must have contemplated accidents and injuries of that character. In *Bates* v. *Railroad Company*, 147 Massachusetts, 255, *S. C.*, 17 N. E. Rep. 633, the agreement between the express messenger and the express company was that the former 'will assume all risk, and [of] accidents and injuries resulting therefrom, and will hold said company free and discharged from all claims and demands in any way growing out of any injuries received by him while so riding.' In *Hosmer* v. *Railroad Company*, 156 Massachusetts, 506, 31 N. E. Rep. 652, the plaintiff was an expressman, and had agreed that, in consideration of the company's allowing him to ride in baggage cars on its trains, he would 'assume all risk of accidents and injuries resulting therefrom.' In both cases the language of the contract, although not expressly including injuries or accidents by negligence, was construed to relieve the railroad company from liability for injuries by negligence. In *Chicago &c. R. Co.* v. *Wallace*, 66 Fed. Rep. 506, *S. C.*, 14 C. C. A. 257, *S. C.*, 24 U. S. App. 589, *S. C.*, 30 L. R. A. 161, the language of the contract was as general as it is in the present case, and the railroad company was exonerated from liability" (130 Fed. Rep. p. 873).

We see no ground whatever for the conclusion that it was not the intention of the parties to give the Railroad Company immunity from negligence in the case of the workmen, and in view of the provisions and purpose of the contract it cannot be held that they had a different intention with respect to the camp and grading outfit and supplies. When they agreed that all movement of this property at less than tariff rates should be at the risk of the Construction Company and later in the supplemental contract that the Railway Company should

assume "no obligation or risk" in the case of damage to supplies, we think it clear that they meant to cover the entire transportation risk, with respect to this property and that losses such as occurred in this case, whether or not attributable to the negligence of the Railway Company were within the stipulated immunity.

It is therefore unnecessary to discuss the assignments of error which are based upon the ruling of the court with respect to the submission to the jury of the question of negligence. Our conclusion is that, upon the facts disclosed at the trial, the Railway Company was entitled to a direction of a verdict in its favor, and the judgment sustaining the recovery by the Construction Company must therefore be reversed.

*The judgment is reversed and the case remanded to the Supreme Court of the State of Arizona as the successor of the Territorial Supreme Court, for such further proceedings as may not be inconsistent with this opinion.*