## CLEVELAND, C., C. & ST. L. RY. CO. v. NEW YORK, C. & ST. L. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. December 19, 1925.)

No. 3599.

1. Carriers ⬪100(1)—Railroad having entire supervision and control of unloading of cars at tie-creosoting plant held not entitled to charge demurrage on cars loaded with ties from another company and held beyond tariff free time for unloading.

Where railroad having contract with tie-creosoting company requiring it to furnish for treatment more ties than it needed annually, and to itself unload incoming ties or pay creosoting

company therefor, made contract with another road for treatment of ties for it on payment of proportionate share of cost, and thereafter elected to have unloading done by creosoting company, but retained exclusive control and supervision thereof, it was not entitled to charge such other company demurrage on cars loaded with its ties and detained for unloading beyond tariff free time.

2. Carriers ⬪100(1)—Contract between railroads, if construed as not entitling one of them to charge demurrage on cars loaded with ties of the other at creosoting plant, held not to result in violation of Interstate Commerce Act (Comp. St. § 8563 et seq.).

Contract between railroads, if construed as not allowing one of them having charge of unloading of ties at creosoting plant to charge demurrage on cars loaded with ties of the other and retained for unloading beyond tariff free time, held not to result in discrimination, in violation of Interstate Commerce Act (Comp. St. § 8563 et seq.), inasmuch as transaction was independent of railroad's duty to public as common carrier.

In Error to the District Court of the United States for the District of Indiana.

Action by the Cleveland, Cincinnati, Chicago & St. Louis Railway Company against the New York, Chicago & St. Louis Railway Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Plaintiff in error, known as "Big Four" Railroad, brought the action against the defendant in error railroad company, which is the successor of the Lake Erie & Western Railroad, designated herein as "Lake Erie," for the recovery of demurrage for detention of Big Four cars during the years 1920, 1921, and 1922. At the close of the evidence the court directed a verdict against the plaintiff, and rendered judgment accordingly.

In April, 1912, Big Four made a contract with the American Creosoting Company, herein called the Company, whereby the latter was to procure with approval of Big Four suitable land and tie storage yards adjacent to Big Four tracks at or near Indianapolis, and erect thereon a plant for creosoting Big Four ties and timbers, the plant to have capacity for treating each year 1,500,000 ties. The Company, under plans to be approved by Big Four, was to grade the land, and at its own cost to provide tracks, switches, and other appurtenances for operating the plant, and for the movement of ties from cars or tie piles to treating plant, and from plant to place of unloading treated ties. Big Four at its cost was to construct and maintain all necessary tracks, switches, etc., for the delivery of ties to the plant for treatment "including all necessary standard

gauge tracks for delivery of ties to the storage yard and for outbound shipment of ties and timber after treatment," and tracks laid by Big Four shall remain its property, and after expiration of contract may be by it removed. During the 10 years following location of plant at Indianapolis the Company agreed to treat, and the Big Four would supply for treatment, 8,000,000 ties in substantially equal annual amounts, and Big Four might require on reasonable notice treatment of ties up to 1,200,000 per year. Big Four agreed to furnish promptly as may be needed sufficient cars for making deliveries to and from the plant and to do all necessary switching of cars at its own expense and without delay. The Company agreed to treat no ties or timber for others unless it can be done without affecting adversely the work of the Big Four, and to perform no services for others without consent of Big Four after expiration of contract.

It was stipulated that material delivered at plant not in condition for immediate treatment shall be unloaded by Big Four in the storage yard, and that Big Four may, if it so elects, require the Company, at agreed compensation, to do the unloading from cars to storage yard, separate various dimensions of ties and timbers or kinds of wood and stack them, but that the manner of piling and stacking ties and timbers shall be as directed by the Big Four. Big Four was to have access to the plant and right of inspection of all operations, and Company was to be bailee of all ties coming into its possession. On termination of the contract Big Four had the option of purchasing the plant upon terms specified. The Company agreed to give Big Four all freight business it can control upon freight rates equal to those of Big Four's competitors, and Company agreed not to assign contract without written consent of Big Four. Company's compensation was as fixed, but is here immaterial. A supplementary contract provided mainly for installation and maintenance of fire protection, and contained a clause that the Company shall without expense to Big Four furnish satisfactory office facilities for Big Four's employees at and about the plant by construction of an addition to the Indianapolis plant.

In July, 1913, Big Four, Lake Erie, and the Company entered into a contract whereby Lake Erie was admitted to share in the facilities of the plant, it being agreed that Lake Erie's ties may be treated upon the same terms as they are treated for Big Four under the contract of 1912, and that ties treated for Lake Erie should apply on the total which Big Four was to supply for treatment by the Company, and that the Lake Erie shall 30 days after presentation of the bills pay to Big Four the proportion of cost of operation and maintenance and renewals of Big Four facilities and of the expense incurred by Big Four in handling and treatment of Lake Erie ties as the number of Lake Erie ties treated bears to the total number treated for both roads during the year, and that "the expense attendant on the use of such facilities shall include the maintenance and renewal of the standard gauge tracks, including frogs, switches, and other appurtenances of first party, the operation and maintenance of the fire protection facilities at said plant, including pumps and tanks; the cost of handling ties into the storage yard at said plant, including the expense of switch service incident to the grouping, sorting and stacking said ties, salaries of the employees of the first party (Big Four) at said plant in connection with the handling, storage and treatment of ties, together with interest at 6 per cent. per annum on the moneys expended by the first party in the installation of tracks, fire protection and other facilities, and on additions which may from time to time be made thereto. It is understood that the above expense is exclusive of and in addition to transportation or tariff switching charges." This contract was for one year with right to renew from year to year, and right of cancellation in either party on 90 days' notice.

The plant was constructed at Indianapolis, and Big Four equipped the yard with tracks and other facilities for handling the cars. At first Big Four did the unloading of the cars coming into the yards, but in 1914 availed itself of the clause in the contract which provided that the Company should unload the cars at the stipulated price. There were about 11 tracks in this yard. The ties for Lake Erie were brought into the yard from the Big Four road, and were by Big Four generally placed upon the same track, but at times some were placed on other tracks and some of Big Four stacking space used to facilitate unloading. The cars were switched in by Big Four employees, and the unloading, sorting, and piling of the ties was wholly under supervision of men employed by Big Four, the Lake Erie having no employees in the yard or plant. Bills for the actual unloading were made to the Lake Erie by the Company, and from time to time, the bills for Lake Erie's proportion of the expense of maintaining the

yard and supervising the handling of ties, and interest charge on the investment of Big Four, as also freight bills (not including demurrage) were rendered by Big Four and paid by Lake Erie. The practice was for Lake Erie to notify Big Four that its cars of ties were coming, and thereupon Big Four employees received and switched and spotted the cars, supervised their unloading and the sorting and stacking in the yards, where this was necessary, and reported to the Lake Erie the number and grades of material unloaded for treatment. The claimed demurrage, aggregating over $10,000, is for alleged detention beyond the free period of Lake Erie cars delivered for unloading in the storage yard, under the published tariff rates of Big Four.

Frank L. Littleton and Forrest Chenoweth, both of Indianapolis, Ind., for plaintiff in error.

Samuel D. Miller and Thomas D. Stevenson, both of Indianapolis, Ind., for defendant in error.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] The one question involved is the right of the Big Four to charge the Lake Erie demurrage for detention of cars held for unloading beyond the tariff free time, upon cars loaded with Lake Erie ties sent to the tie storage yard for unloading and stacking there. If the relations of the parties were such that responsibility for the unloading or procuring the unloading of the cars devolved on the Big Four and not on the Lake Erie, the latter is not chargeable with demurrage, since plainly the Big Four could not recover for the consequences of its own default.

It seems clear from the contract between these parties that it was not intended to place upon the Lake Erie any duty or obligation with respect to these cars beyond sending them in and paying the stipulated bills for handling and treating the ties. The contracted service of the Big Four surely included the unloading of the cars, for the ties could not be handled and stacked in the Big Four's tie storage yard without being unloaded. Besides there is no provision whatever in the contract for the Lake Erie to do any part of the work of handling the ties. The contract of 1912 between the Big Four and the Creosoting Company provided that the Big Four and the Creosoting Company should unload the ties, unless it elected to place that

duty upon the Company, in which case the Company would be paid one-half cent per tie for this service. If the Big Four itself had continued to unload the ties, as it was doing during the first year of its agreement with the Lake Erie, doubtless no question of demurrage would have arisen, as the contracted duty of the Big Four to unload was clear. Indeed it does not appear that any question of demurrage arose during the years that these joint relations existed.

It was testified that the unloading cost the Big Four one cent per tie, and that in 1914 it elected to have the Company do it at the agreed price of one-half cent, and thereafter the Company did it. We are of the opinion that in doing this the Company did it as an agency or instrumentality of the Big Four, and that this did not change the relation between the Lake Erie and the Big Four with respect to unloading the ties, save only perhaps in the manner of paying for that service. Instead of paying its proportion of that expense as theretofore, it thereafter paid the Company one-half cent per tie. But it is not necessary to go thus far, for it appears that notwithstanding the Company did thereafter unload the ties, the Big Four nevertheless maintained entire supervision and control over the unloading and handling as it theretofore had done, and of all the operations in that yard, the Company supplying only the men who under such supervision did the actual work of unloading. Not only did the 1912 contract provide that in case the Company undertook the unloading the manner of stacking the ties should remain under control of the Big Four, but the uniform practice after the Company began to unload the ties was for the Big Four to supervise the unloading. Its superintendent of the storage yard testified that he would indicate to the Company how many men were necessary from time to time to handle this work for the speedy disposition of it and the Company would supply the men. He said the Lake Erie might have had a gang of its men to unload its ties, but "I should judge they would have had to make an arrangement with the Big Four to do that. * * * They would have had to know all about the arrangements of the stacks, where they were, and all that sort of thing. But that was never done. We didn't expect anything like that. That is what I [we] were there for." He stated that there was no discrimination against the Lake Erie cars, and that he exercised the same control and supervision of Lake Erie as Big Four cars. It was immaterial to the Lake Erie

whether the physical work of unloading was done by the Big Four itself or, under its supervision, by the Company. It had no part or duty in the unloading, and the Big Four had or assumed direction of it all. On this proposition it is not material whether the payment of one-half cent per tie for unloading was made by the Lake Erie to the Big Four, or directly to the Company, as was done for most of the time. This sum was definite, and it was evidently more convenient to pay it to the Company.

Neither do we find anything in the contention made for the Big Four that the track on which mainly were set the Lake Erie cars became a Lake Erie track, and that placing the cars thereon constituted delivery to the Lake Erie. Whether the Big Four cars would be placed on any one or several of the dozen tracks in the yard was a matter within control of the Big Four. It would set them where most convenient for its operation of its facilities. Indeed, it was testified that at times Lake Erie cars were on various tracks for unloading, all as best effected the speedy handling of all. In this as in other matters pertaining to the speed and orderly disposition of the business there, the Big Four had entire control, and the Lake Erie none whatever.

We need scarcely notice the contention that the Big Four employees at the yard, while handling Lake Erie cars, should be considered Lake Erie employees. The practice there, as well as the contracts themselves forbid such construction.

[2] But it is urged that the published tariffs of the Big Four do not make provision for its unloading of cars, and that even if this were contracted for it would be in violation of the tariff, and that to unload for this shipper would be violative of the Interstate Commerce Act (Comp. St. § 8563 et seq.). Generally speaking this would be true. But as said in Santa Fé, etc., Ry. Co. v. Grant Bros. Co., 228 U. S. 177, 33 S. Ct. 474, 57 L. Ed. 787: "Manifestly, this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such case it is dealing with matters involving ordinary considerations of contractual relation." Here there was a special and an unusual situation, quite outside the relation of the carrier toward the public. The Big Four controlled this facility for creosoting ties and timbers, and the appurtenant storage yards and tracks. Manifestly the capacity of the plant and the investment of the Big Four were materially larger than proved necessary for its require-

ments, and it found itself obligated to supply for treatment a yearly minimum of ties greater than it needed. It was evidently deemed advantageous to share these facilities with some other road, which might make use of them, and terms for such use were agreed upon whereunder the Lake Erie brought its ties and timber there for treatment, and its ties there treated would apply upon the Big Four's required annual quota.

It is reasonable to assume that there could not well be a divided responsibility in the control of these facilities, and in the supervising, the setting and unloading of the cars, and it doubtless would not have been to the advantage of either railroad to have any of those functions under the direction of more than one of them. So for the benefit of all, this general direction and control was left where it had been, with the Big Four, and without any participation whatever by the Lake Erie. The mutual advantage to the parties in so operating is evident from the fact that year after year the contract, and the indicated practice under it, continued, notwithstanding cancellation could have been effected upon 90 days' notice. Nothing appears in the record to indicate in any degree that the contracts and the practice under them were for the purpose of avoiding demurrage payment, or for granting to the Lake Erie any special and unlawful privileges.

It was testified that the Big Four paid per diem charge on foreign cars while in this yard. While it does not appear whether this charge was included in the yard expense bills, it is not material on the question of demurrage whether per diem was in fact paid, or if paid, whether or not it was included or includable in the yard expense. If the delay was occasioned by insufficient yard or handling facilities, the responsibility therefor rested on the Big Four whose duty it was to provide them.

Under all the circumstances the plaintiff's retention of supervision over the unloading was not a transgression of the schedules filed, nor of the duty to the public of these railroads or either of them as common carriers. Besides it cannot be said that the Lake Erie was having its ties unloaded free of charge. When the Big Four was itself unloading them, the proportionate cost of it was charged to the Lake Erie, and when it ceased actually to unload them, not only did the Lake Erie pay the contracted price of one-half cent per tie for the unloading, but it paid also to the Big Four its proportionate share of the cost of the general supervision

over the unloading and other handling of the ties and timbers when it paid its part of the total expense of maintaining and operating the yard.

No good reason appears to us why the Lake Erie should be charged with demurrage, and the judgment of the District Court is affirmed.