Erie Railroad Co., Appellant, *v.* Public Service Commission.

444

Argued April 16, 1930.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*Walter L. Hill* of *Knapp, O'Malley, Hill & Harris,* and with him *Grover R. James,* for appellant.

*E. C. Marianelli,* for intervening appellee.

*Daniel H. Kunkel,* Legal Assistant, and with him *E. Everett Mather, Jr.,* Assistant Counsel, and *John Fox Weiss,* Counsel, for The Public Service Commission.

Opinion by Keller, J.: September 29, 1930:

The Erie Railroad Company appeals from an order of the Public Service Commission directing it to re-establish passenger service between Jessup and Underwood Breaker, which it had discontinued without the consent of the commission.

Appellant is an incorporated company doing the business of a common carrier within this Commonwealth. Many years ago it built a branch line from

the town of Jessup to Underwood Breaker for the purpose of transporting coal from the mines to market, and operated it as a common carrier of freight. In November, 1918, at the request of the Pennsylvania Coal Company, which operates a mine at Underwood Breaker,—where there is a village of from 25 to 30 houses,—it established a passenger service which left Jessup at 6:20 A. M. for Underwood Breaker and returned from there to Jessup at 4:10 P. M., its purpose being to furnish a convenient means of transportation from Jessup to the Underwood Breaker and return, for the miners who lived in and about Jessup. Jessup is two and one-sixth miles from the Underwood Breaker by appellant's railroad, but seven miles by road or highway. About five hundred miners employed by the Pennsylvania Coal Company at its Underwood mines live in Jessup. It was agreed that the Pennsylvania Coal Company should pay the fare of its miners traveling on this train and guarantee a minimum of $52 for each round trip. Coincident with the establishment of this train appellant filed with the Interstate Commerce Commission (I. C. C. No. 1243) what it designated as "Local Passenger Tariff of charges for transportation of miners and other persons in special miners' trains between Jessup, Pa., and Underwood Breaker, Pa. Issued November 14, 1918. Effective November 16, 1918. Published for the Director General of Railroads and filed on one day's notice with the Interstate Commerce Commission under Passenger Fare Authority No. 567 of the Director, Division of Traffic, United States Railroad Administration, dated November 8, 1918." It contained the following "Rules and Regulations":

"Fare—Ten (10) cents per capita in either direction. Train Guarantee: Minimum of $52 per train for each round-trip. Children—No reduction in fare will be made for children. Conditions—No tickets will be

issued, but conductor will report on Form 890 the number of persons carried on eadh trip. Baggage—No baggage will be checked on these trains."

A like tariff was filed by appellant with the Public Service Commission of this Commonwealth (P. S. C. Pa. No. 103).

On August 20, 1920, appellant filed a second "Local Passenger Tariff of Charges for transportation of miners and other persons in special miners' trains between Jessup, Pa., and Underwood Breaker, Pa.," effective August 26, 1920, I. C. C. No. 1308, (cancelling I. C. C. No. 1243), and P. S. C. Pa. No. 124, (cancelling P. S. C. Pa. No. 103), which contained exactly the same "Rules and Regulations" as in the first tariff, except that the fare was raised to twelve cents per capita in either direction, and the train guarantee was raised to a minimum of $62.40 per train for each round trip. It also contained the following notes: "The increased fares and charges shown herein are established on five days' notice under authority of the opinion of the Interstate Commerce Commission in ex parte No. 74—Effective upon not less than five days' notice by special permission of the Public Service Commission of the Commonwealth of Pennsylvania No. 2367, dated August 10, 1920." When the second or increased tariff was filed the railroad was in the control of its own officers and not under the Director General of Railroads.

In 1929 appellant filed a "supplement No. 1" to I. C. C. No. 1308 and P. S. C. Pa. No. 124, cancelling the "Local Passenger Tariff" above, effective June 1, 1929, as follows: "Cancellation Notice. Fares and arrangements published in Local Passenger Tariff effective August 26, 1920 are cancelled; no such fares and arrangements in effect."

It seems clear to us that when the Director General of Railroads in 1918, and the officers of the appellant

company in 1920, filed the Local Passenger Tariffs above mentioned covering this service, they considered that they related to a public service and not merely a private contract, as is now contended by appellant. Had it related to a mere contract of private carriage —assuming for the moment that under the Constitution of Pennsylvania such a contract was permitted appellant—no filing and publication of tariffs would have been necessary. It would have been a matter,— at least until the good faith of the arrangement was questioned—with which neither the Interstate Commerce Commission nor the Public Service Commission of Pennsylvania was concerned. The provisions of the tariffs point to the same conclusion. They relate to the charges for transportation of miners and *"other persons,"* not restricting the carriage to workers at the Pennsylvania Coal Company's mines. A definite per capita fare is established for carriage in either direction. The train guarantee is not limited to the Pennsylvania Coal Company; in fact, the Pennsylvania Coal Company is not mentioned in the tariff. It specifically excludes any reduction in fare for children, none of whom within the age for which a lower fare is usually allowed are permitted to work in mines in Pennsylvania. It likewise excludes carriage of baggage, which would not be necessary if the transportation was limited to workers at the mines.

The filing of the tariffs and their contents satisfy us that while the aim and object of the establishment of the train service was the carrying of the Pennsylvania Coal Company's miners from Jessup to the mines and return, appellant was careful to proceed with its institution in such a way that there could be no question of its power and authority to perform it as a common carrier. It used the same track, the same facilities and the same crew that it used as a common carrier of freight. It filed its passenger

tariffs, as it would do in the case of the establishment of any new passenger service, and it made them general in form and not restricted to the carriage of the employees of any particular person or corporation. That it knew that the service would be used almost exclusively by the employees of the Pennsylvania Coal Company did not affect the generality of its tariffs or convert what it held out to the world as a public service into a mere contract of private carriage. The tariffs were broad enough to cover the public even though the company recognized that the public using the train might nearly all be employees of one coal company.

The situation is not unlike that which often occurs in the enactment of legislation under our present State Constitution. A bill is introduced into the legislature whose real aim and object is the securing of some local or individual relief from a supposed hardship in the general law, but as such an act so entitled would be unconstitutional, it is drawn in general terms so as to avoid the constitutional inhibition against local or special legislation and is enacted into law as a general statute, though its purpose, at bottom, was to supply relief to some individual case. It is none the less a general act, though it was passed to meet an undisclosed individual case.

Our conclusion is not affected by the circumstance that the tariffs provided that no tickets would be issued —that course has been adopted in some cases of unquestioned public carriage, where many passengers are carried for a short distance. As a matter of fact tickets were afterwards issued by the appellant for the account of the Pennsylvania Coal Company to cover travel by its employees, it having been found that there was less dispute as to the number of passengers carried if tickets were handed out by the Coal Company's agent and taken up on the train rather than a

count made by employees of the two companies, who did not always agree. The evidence in the case showed that the train was from time to time used by persons other than the miners of the Pennsylvania Coal Company, though it did not appear just how payment of fare was made for them; one witness stating that it was easy to get the tickets from some of the workmen. Nor by the fact that the train service as actually put into effect, was available only on days when the Underwood mine was being operated. Practically no one was inconvenienced by this regulation and no one in consequence objected, but that did not alter the character of such service as was rendered.

The Constitution of Pennsylvania provides (Art. XVII, Sec. V), "No incorporated company, doing the business of a common carrier shall directly or indirectly, prosecute or engage in mining or manufacturing articles for transportation over its works; nor shall such company, directly or indirectly, engage in any other business than that of common carriers, ......" It may be that it was a regard for this constitutional inhibition which led the authorities in charge of appellant's affairs to choose to work out the Pennsylvania Coal Company's suggestion by a form adapted for the public transportation of passengers as a common carrier rather than by an attempted contract of private carriage.

All of the cases cited and relied on by the appellant are easily distinguishable from this one. In the express messenger and Pullman employee cases, there was no contention or ruling that the railroad was not a common carrier of passengers. Liability for injury to the express messenger or Pullman employee who had exonerated the railroad from liability for its negligence, was denied on the ground that in the circumstances of his employment he was not a *passenger* of the railroad company. Thus in Baltimore & Ohio Ry.

Co. v. Voigt, 176 U. S. 498, it was held that an express messenger in charge of express matter pursuant to a contract between the express company and the railroad company was not a passenger of the latter within the meaning of the rule of Railroad Co. v. Lockwood, 17 Wall. 357; that he was not constrained to enter into the contract whereby the railroad company was exonerated from liability to him for its negligence; and that such a contract did not contravene public policy. His position was one "created by an agreement between the express company and the railroad company, adjusting the terms of a joint business—the transportation and delivery of express matter. His duties of personal control and custody of the goods and packages, if not performed by an express messenger, would have to be performed by one in the immediate service of the railroad company." It was clear that although the messenger was actually carried on the train, and although the railroad company received compensation for its carriage of express matter, his relation to the railroad company was "widely different from that of ordinary passengers" and there was no justification for extending the doctrine restricting the freedom of contract to a case which lay entirely outside the reason which supported it. A like principle was applied in Santa Fe Ry. v. Grant Bros., 228 U. S. 177, so strongly relied on by appellant. There Grant Bros. had a contract for the construction of a branch railroad for the railway company, which provided that the railway company would haul the contractor's supplies to the end of track, at the contractor's risk of loss and damage, and would carry the contractor's supplies over its lines at a special rate lower than the tariff filed, "all movements of goods at less than tariff rates to be at the consignee's risk of loss and damage." The work being finished the railway company took up the men, outfit and supplies of the contractor at the

end of the track for the purpose of transporting them to Phoenix and four of the cars were destroyed by fire when on a side-track on the way to destination. It was held that the doctrine restricting the right to make a contract relieving the common carrier of liability for its own negligence did not apply. The Supreme Court, speaking through Mr. Justice HUGHES said: "In constructing, improving or repairing its road, and in building its extensions and branches, the railroad company is providing facilities for its service as a common carrier, but of course is not acting as such. It may do the work itself, if it chooses, or it may make it the subject of contract with another. In the latter case it simply employs an appropriate agency. The haulage by the railroad company of the men, appliances and supplies, required by the contractor for the purpose of the construction or improvement, to or from the point on its line where the work is to be done, is merely incidental to the work itself. The cost of such haulage is obviously an item of expense which must be taken into account in fixing the terms of the construction contract, and in providing for it over its own line the railroad company may adjust the matter with the contractor as it sees fit. If the railroad company did the work directly it would have to take its employees and the necessary outfit to the place of work and it may undertake to do the like for the contractor, either free of charge or at reduced rates, as they may agree . . . . . . It is clear that in dealing with transportation of this character over its own road, in connection with construction or improvement, a railroad company is not acting in performance of its duty as a common carrier, and the arrangement for free or reduced rate carriage for the necessary materials and men used in the work, when it is a part of the contract, entered into in good faith and not as a subterfuge, is not obnoxious to the provisions of law prohibiting departures

from the published tariffs, for the reason that such an agreement lies outside the policy of these provisions.''

The case has no application to the facts here present. The appellant railroad company was engaged in no improvement or construction work of its own; the persons carried were not employees of it or of its contractor. They were passengers carried under a regular tariff filed with the Interstate Commerce Commission and the Public Service Commission, and the fact that the underlying reason for the establishment of the train service was the desire of the Pennsylvania Coal Company to have its employees transported to its mine does not affect the public character of the service established.

We are not sure, in view of the constitutional provision above quoted, that the case cited by appellant, (C., R. I. & P. Ry. Co. v. Maucher, 248 U. S. 359) and similar cases, which hold that an employee of a circus, who was hurt by the negligent operation of a passenger train of a railroad company while he was traveling on a train owned by the circus, which was being hauled over the tracks of the railroad company by its locomotive and crew pursuant to a special contract declaring the company not a common carrier therein and waiving liability for negligence, was not a passenger of the railroad company, apply in Pennsylvania. See Forepaugh v. D. L. & W. R. Co., 128 Pa. 217, 231, 232; but in any event they do not affect our conclusion. If such hauling is done under a tariff filed with the Interstate Commerce Commission as common carriage of goods and passengers, it is a public service and not mere private carriage. But in any event they relate only to negligence in connection with occasional special contracts of haulage, not to the regular transportation of passengers affecting a whole community; and if the circus employees had been transported on the railroad company's trains under regularly scheduled rates of

fare, with no waiver of liability for negligence, there would have been no question of the railroad company's liability to them as passengers.

The report of the commission furnishes full justification for its order.

The gist of the order of the commission was that the appellant re-establish its service. To do so, a tariff is essential. The order of the commission only placed appellant back where it was at the time it unlawfully discontinued the service without the consent and approval of the commission.

The commission, of course, cannot require the Pennsylvania Coal Company to pay for the transportation of its miners to and from its mines, nor to guarantee a minimum train fee to appellant; and to the extent that the tariff filed covers or applies to these matters, it is inoperative and of no effect. The appellant has itself recognized this by charging and collecting from its passengers since the re-establishment of its service a fare of twelve cents for each rider in either direction, thus giving the order the only practical construction. The order expressly leaves the matter open to change or modification as circumstances may require.

The appeal is dismissed and the order of the commission affirmed.