SCOTT TRUCK LINE, INC., Plaintiff,

v.

CHICAGO, ROCK ISLAND AND PA-
CIFIC RAILROAD COMPANY,
Defendant.

No. 69 C 2626.

United States District Court,
N. D. Illinois, E. D.

April 28, 1970.

**512**

Denver to Chicago. It issued a through bill of lading to National and, pursuant to an existing agreement and supplemental agreement with defendant, delivered the cargo in a refrigerated trailer to defendant for shipment aboard one of its flatcars.[1] When the train reached Chicago the meat was spoiled, and plaintiff subsequently paid National for the damage. Claiming that the cargo was in good condition when it was delivered to defendant, plaintiff brings this action to recover the amount of its settlement with National.

The complaint contains two counts. Count 1 charges defendant with negligent failure to inspect the trailer and cargo, while count 2 merely charges delivery to defendant in good condition and receipt in bad condition. Liability on both counts is predicated on the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(12), which provides in pertinent part:

> "The common carrier, railroad, or transportation company issuing such receipt or bill of lading * * * shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property * * *."

Joseph V. Dowd, Dowd, Dowd & Dowd, Chicago, Ill., for plaintiff.

James E. Sykes and O. L. Houts, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

Plaintiff, a common carrier by truck, contracted with National Food Stores, Inc., to transport a cargo of meat from

Defendant pleaded as an affirmative defense that the supplemental agreement between the parties, which imposed certain duties of inspection on the railroad, also included an exculpatory or indemnity clause which relieves defendant from liability to plaintiff for any damage to the cargo caused by its own acts or omissions.[2] Presently before the court

1. This method of transport, known as Trailer on Flat Car (TOFC) or "piggyback", is described in detail in Ex Parte 230, Substituted Service—Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service), 322 I.C.C. 301 (1964).

2. That clause provides in pertinent part: "Motor Carrier hereby releases and

agrees to indemnify Railroad, its agents and employees, and hold them harmless from all loss and damage arising from the failure of the mechanical refrigeration unit of any Trailer to protect the contents of such Trailer from heat or cold due to any cause whatsoever, regardless of any act or omission by the Railroad, its agents and employees, in performing or failing to perform any

is plaintiff's motion to strike this affirmative defense.

It is agreed by plaintiff and defendant that they occupy the status, respectively, of originating and connecting carrier and that, absent the exculpatory clause, Section 20(12) would apply. And for purposes of this motion it is assumed that the agreement in suit satisfies all formal requisites of the law of contracts. Plaintiff's challenge, therefore, rests on its allegation that the exculpatory clause is void because contrary to the common law and to the provisions of the Carmack Amendment.

Section 20(12), which imposes liability on the connecting carrier, does not expressly prohibit exculpatory agreements. And although the common law prohibits such agreements between carriers and shippers, New York Cent. Railroad Company v. Lockwood, 84 U.S. (17 Wall.) 357, 21 L.Ed. 627 (1873), no case has been cited or disclosed which considered the applicability of this rule to contracts between carriers.[3] This court must therefore look to the policy of the Interstate Commerce Act, and elsewhere, for the proper resolution of this question.

The Carmack Amendment makes the originating carrier liable for damages to a shipper's cargo regardless of whether the damage occurred on its line or on the line of a connecting carrier. 49 U.S.C. § 20(11). The principle underlying this provision is that connecting carriers are the agents of the originating carrier, and the originating carrier as principal must therefore respond in damages to the injured shipper. This provision was designed to relieve the shipper of the obligation to determine where the loss occurred, and of the burden of travel to a possibly distant forum to bring suit for his damages. Oregon-Washington R. & Nav. Co. v. McGinn, 258 U.S. 409, 416, 42 S.Ct. 332, 66 L.Ed. 689 (1922); Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 (1911).

Section 20(11) also contains a provision forbidding the originating carrier from exculpating itself from liability to the shipper for damage occurring on its own line or on the lines of connecting carriers. The policy behind this is two-fold—to promote the use of a high degree of care by participants in this important industry, and to prevent exploitation of the often unequal balance of bargaining power existing between the carrier and the shipper. Santa Fe P. & P. Railway v. Grant Bros., 228 U.S. 177, 184–185, 33 S.Ct. 474, 57 L.Ed. 787 (1913); Baltimore & Ohio Southwestern Railway Company v. Voigt, 176 U.S. 498, 506–507, 20 S.Ct. 385, 44 L.Ed. 560 (1900).

Application of these considerations to the exculpatory clause at issue here leads to the conclusion that it offends neither the purpose of the Interstate Commerce Act nor public policy in general. Accordingly, the motion to strike will be denied.

With regard first to the interest of the shipper, an agreement such as this in no way alters his substantive or procedural rights to redress. He may bring suit for damages against either the originating or connecting carrier, in the most convenient available forum, and this clause cannot, of course, be used as a bar to his recovery. See Acme Fast Freight v. Chicago, M., St. P. & P. R. Co., 166 F.2d 778 (2d Cir.1948), rev'd on other grounds, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 (1949), and cases cited therein.

Nor does it appear that the public interest in the efficient and careful

---

inspection or handling required of Railroad by the terms of this Supplemental Agreement."

3. Plaintiff relies on N. Y. Central R. Co. v. The Talisman, 288 U.S. 239, 53 S.Ct. 328, 77 L.Ed. 721 (1933), which reversed a decision upholding an exculpatory "agreement" between connecting carriers. However, the reversal was based on the Supreme Court's finding that no contract existed. It would be idle conjecture to speculate on how the issue would have been resolved had there been a contract.

movement of goods would be harmed by enforcement of such an agreement. It would be folly to argue that a connecting carrier, once it had such contractual protection, would therefore abandon the exercise of due care. The amount paid to defendant by plaintiff for its part of this "piggyback" carriage was fixed by private negotiation between the parties. Negligence by defendant, because it would expose plaintiff to liability to the shipper, would tend to reduce the bargained for compensation it would receive from plaintiff pursuant to future "piggyback" agreements. See Santa Fe P. & P. Railway v. Grant Bros., *supra*, 288 U.S. at 189, 33 S.Ct. 474. Thus defendant's economic incentive to carry out its portion of the transport with care is in no way lessened by the existence of this agreement.

The validity of the above analysis would be seriously weakened if defendant enjoyed a bargaining position strong enough to permit it to dictate the rate of compensation for its "piggyback" operations. This is, however, not the case. At least three alternative methods of transport from Denver to Chicago were available to plaintiff: shipment by its own trucks over the entire route; flatcar shipment utilizing defendant's regular published tariffs for "piggyback" transport to shippers; or the method it in fact chose, viz., flatcar shipment pursuant to a privately negotiated rate with defendant.[4] Had it chosen the second alternative, it would have received a bill of lading from defendant and assumed, in effect, the status of a shipper. Therefore, any attempt by defendant to relieve itself of liability would have been null and void. American Trucking Associations v. A., T. & S. F. R. Co., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); Ex Parte 230, *supra*; 49 C.F.R. 1090.1–1090.8.

It is apparent from what has been said that the contract plaintiff complains of was not tendered to it on a "take it or leave it" basis. Plaintiff could have ensured the recovery over remedy it now seeks by shipping pursuant to defendant's published tariffs. Setting aside this clause of the contract would give plaintiff an unwarranted windfall, for the bargain that was struck presumably reflected the parties' contractual shift of liability.

Noteworthy in this regard is the established doctrine that a carrier can limit the *amount* of its liability to a shipper for damage to his cargo. This rule is analogous to the situation presented here in that such a limitation has been upheld only when the shipper had the option of entering into an agreement whereby the carrier would be liable for the full actual value. The underlying rationale is that, since no imbalance in bargaining power exists in such situations, there is no reason to ignore the parties' agreement. See, *e.g.*, Union Pacific Railroad Company v. Burke, 255 U.S. 317, 41 S.Ct. 283, 65 L.Ed. 656 (1921); Cincinnati, N. O. & Tex. Pac. Ry. v. Rankin, 241 U.S. 319, 36 S.Ct. 555, 60 L.Ed. 1022 (1916); 6A Corbin on Contracts, § 1472.

Aside from the absence of any policy interest in barring an exculpatory agreement such as the one in suit, the wording of the Carmack Amendment itself indicates that Congress intended no such limitation. As noted above, Section 20(11) in terms prohibits the originating carrier from entering into exculpatory agreements, while Section 20(12) contains no such prohibition as to connecting carriers. The absence of such a provision would seem to reflect a Congressional reluctance to preclude contractual adjustments between industry members.

Contracts waiving a statutory obligation are not foreign to the transportation industry. It is the general rule that a railroad, when not acting as a common carrier, may contractually excuse itself from liability for its negligence, and this is so even in the face of statutorily imposed absolute liability.

---

4. The negotiated rate was based on the weight of the cargo rather than on its value.

Colorado Milling and Elevator Company v. Terminal Railroad Association of St. Louis, 350 F.2d 273, 278 (8th Cir.1965); Sunlight Carbon Co. v. St. Louis & S. F. R. Co., 15 F.2d 802, 805 (8th Cir.1926).

Thus, no reason appears, either in the purpose or policy of the Interstate Commerce Act, or from consideration of the public interest in general, which would justify setting aside the challenged contractual provision. The words of the Supreme Court in Baltimore & Ohio Southwestern Railway Company v. Voigt, *supra*, therefore take on special significance:

"[I]t must not be forgotten that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare." (176 U. S. p. 505, 20 S.Ct. p. 387.)

In accordance with the foregoing, the Motion to Strike the Affirmative Defense is denied.