**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellant,**

v.

**ELGIN, JOLIET & EASTERN RAILWAY COMPANY and United States Steel Company, Defendants-Appellees.**

**No. 11484.**

United States Court of Appeals Seventh Circuit.

Jan. 11, 1956.

Castle W. Jordan, Paul H. Heineke, Clarence R. Conklin, Chicago, Ill., for Insurance Co. of North America, plaintiff-appellant.

Harlan L. Hackbert, Chicago, Ill. (Stevenson, Conaghan, Velde & Hackbert, Chicago, Ill., of counsel), for appellees.

Before FINNEGAN, SWAIM and SCHNACKENBERG, Circuit Judges.

SWAIM, Circuit Judge.

The plaintiff, Insurance Company of North America, brought this action against the defendants, Elgin, Joliet & Eastern Railway Company, hereinafter referred to as the "Railway Company," and United States Steel Company and its successor, by merger, United States Steel Corporation, the two latter being sometimes hereinafter referred to as the "Steel Company," to recover the sum of $3,480.54 which plaintiff had paid to its insured, Jack Gray & Company, hereinafter referred to as "Gray & Company," for repairs to its diesel locomotive crane.

The repairs were made necessary by the crane's being struck by a cut of cars of the defendant Railway Company which was being switched on its tracks located on the property of the Steel Company. At the time of the collision, which occurred at night, the crane was stationary. Its boom had been lowered for a few minutes to enable Gray & Company's two employees, who operated the crane, to replace a broken pin in the bucket on the end of the boom.

Immediately after the collision between the string of cars and the crane, and prior to the termination of the lease, hereinafter described, Gray & Company caused the crane to be repaired at a cost of $3,480.54 and, upon collecting that amount from the plaintiff insurance company, Gray & Company assigned to the plaintiff insurance company all of the "rights, claims and interest which the undersigned may have against any person or corporation liable for the loss mentioned above * * *."

The amended complaint alleged that the crane at the time of the collision was under lease from Gray & Company to the Steel Company; that the crane was being operated for the benefit of the Steel Company; and that the proximate cause of the collision was the negligence of the Railway Company. The complaint did not allege negligence on the part of the Steel Company but based its claim to recovery against that company on the fact that it was the lessee of the crane at the time of the collision.

The plaintiff alleged that the terms of the lease of the crane were set forth in a letter dated January 11, 1951, written by Gray & Company to the Carnegie-Illinois Steel Corporation, a wholly owned subsidiary of United States Steel Company. This letter stated:

"We submit herewith our proposal for the rental of one (1) Industrial Brownhoist 30-ton diesel locomotive crane, Serial No. 11742 with magnet and generator to be operated at the Gary Works, Blast Furnace Division, Gary, Indiana, handling shakeout and magnet on the high line for a period of approximately two months starting January 11, 1951.

"The crane is now located at the Gary Sheet & Tin Mill and transportation charges will be for your account.

* * * * * *

"Thank you for the opportunity of submitting this proposal and would appreciate your sending us the purchase order for billing purposes."

■ In answer to this letter the Steel Company sent to Gray & Company its "purchase order" which the above letter requested and which was correctly held by the District Court to also constitute a part of the contract between Gray & Company and the Steel Company.

The letter of Gray & Company proposing to lease the crane to the Steel Company showed familiarity with the practice of the Steel Company in leasing such property. Mr. Gray, of Gray & Company, testified that he had done considerable business in renting such cranes to the Steel Company and that each prior lease of equipment also involved a "purchase order."

By its purchase order the Steel Company expressly and clearly provided under Condition 4 that: "Seller [Gray & Company] agrees to carry insurance in an insurance company satisfactory to Purchaser [the Steel Company] insuring seller's liability to pay and the liability of Purchaser, if any, to pay * * * for all damages to property in any manner caused by, arising from, incident to, connected with or growing out of the performance of the work covered by this purchase, in amounts not less than $50,-000.00 * * *. The obligation to carry this insurance shall not limit in any way the liability assumed by Seller specified elsewhere in this purchase."

In Condition 7 of this purchase order it was provided that: "Seller agrees to bear all loss and damage to * * * equipment * * * not owned by Purchaser which are used or are to be used by Seller in the prosecution of the work covered by this purchase, however [sic]

such loss or damage may be caused or occasioned, whether by fire or otherwise and to indemnify and save Purchaser harmless from and against all liability for such loss and damage."

Finally, Condition 9 of the purchase order provided that: "Seller agrees to indemnify, save harmless and defend Purchaser and the other subsidiary companies of United States Steel Corporation [the defendant Railway Company here was a wholly owned subsidiary company of United States Steel Company], and each of them, from and against all suits, actions, legal proceedings, claims, demands, damages, costs, expenses, and attorney's fees in any manner caused by, arising from, incident to, connected with or growing out of the performance of the work covered by this purchase."

The trial court found that the proposal of Gray & Company in its letter of January 11, 1951, together with the Steel Company's purchase order, constituted the contract of lease of the locomotive crane, and that the contract of the parties therefore included Conditions numbered 4, 7 and 9, as quoted above. The District Court further found that the proximate cause of the collision was the failure to place red warning lanterns along the railroad track to warn of the presence of the crane on the tracks; that the evidence did not disclose who was responsible for the failure to place such warning lights along the track, but that the court must assume that it was not the failure of the Railway Company; and that the failure of the Railway Company to have a trainman "riding the leading end of the cars being switched was not the proximate cause of the collision." The court next found that under the provisions of the contract between Gray & Company and the Steel Company the Steel Company assumed no responsibility for the loss of or damage to the locomotive crane during the period of the lease. The court also found that the plaintiff, by reason of its payment of the loss and assignment, became subrogated to the rights of Gray & Company, but

that as such subrogee it was not entitled to recover against either defendant.

The trial court therefore concluded that plaintiff had not proved its cause of action against either of the defendants, and entered judgment against the plaintiff. Under the facts of this case as shown by the evidence and under the applicable law, we think the judgment of the trial court may not be disturbed.

In his opening statement the attorney for the plaintiff said that the testimony of Mr. Best, one of the two employees which Gray & Company under the terms of the lease furnished to operate the crane, would disclose that while they were working on Steel Company work a brakeman was supplied by the Steel Company, and that "the Steel Company had complete control of guarding the tracks, of blocking them off with flares or flags or whatever manner they chose to protect this crane from just such an occurrence as this was."

The attorney for the Steel Company in his opening statement pointed out that no negligence on the part of the Steel Company was alleged, but the plaintiff made no move to amend its complaint.

Mr. Best, the operator of the crane, did not testify as the attorney for the plaintiff had indicated that he would. Instead he testified that he had been hired and was paid by Gray & Company to operate the crane; that he had been operating this crane in Yard K of the Steel Company since January 1951; and that while he was so operating this crane neither he nor his oiler placed flags or flares out to protect the tracks they were working on. Best testified further that when he moved the crane he was told where to move it by the yard master, an employee of the Steel Company; but that he and his oiler moved the crane from place to place in the yard without help from anyone else. Best thereby contradicted the statement of plaintiff's attorney that they were furnished a brakeman by the Steel Company and "that the Steel Company had complete control of guarding the tracks, of blocking them off with flares or flags."

On cross-examination Best testified that it was customary for red warning lights to be placed at the switch nearest to which the crane was working. He said that he could not "say for sure" whether such lights would be placed on the track in both directions from the crane. Nor did he know "for sure" whether any warning lights were in place on the night of the accident. Best testified that neither he nor his oiler ever placed any such warning lights; that there were lights on the boom of the crane and two lights on the back of the cab of the crane, but he was "not sure they were working at all times or not." The boom of the crane was on the opposite side of the cab from the side struck by the railroad cars.

Best further testified that the simple repairs they were making at the time of the accident, replacing a pin in the bucket of the crane, would normally take only ten or fifteen minutes, and that the necessity of the repairs was discovered by him only a few minutes before the accident occurred.

In answer to questions by the court, Best said that when the crane was being moved from place to place in the yards of the Steel Company his oiler switched for him, not an employee of the Steel Company. As to the danger signals, Best said: "They were lanterns and we carried red flags on the crane but I don't remember any occasion of using them." He said that he never had anything to do with putting out flags or lights 'and that neither did his oiler, "so far as he knew." Best said that "to the best of his knowledge" it was the "steel mill men" that did it.

Rule 26–A of the Operating Rules of the Elgin, Joliet & Eastern Railway Company is as follows:

"On yard and industrial tracks, when a red signal is displayed between or above the rails of the track, indicates that work is being done on that track. Engines must not proceed on that track until proper information is obtained and/or the red signal is removed. Workmen displaying the red signals are alone authorized to remove it."

This rule seems to indicate that it is the duty of workmen blocking a track to put out the warning signals. Best indicated that he thought it might have been the duty of the employees of the Steel Company to put out the flares or warning signals, but, as the trial court indicated, the evidence here fails to disclose on whom that duty rested. If it had been the duty of the employees of the Steel Company, the evidence fails to disclose that the Steel Company had, or by the exercise of reasonable care should have had, notice of the situation here which required the use of warning signals. But, as we have pointed out above, the amended complaint did not even charge negligence against the Steel Company. The attempt of the appellant to change the theory of its action by the arguments contained in its briefs filed in this court comes too late.

We think it is equally clear that the plaintiff failed to prove the charge of negligence which it did make in its amended complaint against the Railway Company. The complaint merely stated that the "Railway Company, acting by and through its duly authorized agents and employees, so carelessly and negligently conducted itself that one of its trains collided with" the crane. This charge was based on an alleged violation by the Railway Company of one of its operating rules which provided that: "When cars are pushed by an engine, except when shifting or making up trains in yards, and even then when conditions require, a trainman must take a conspicuous position on the leading car."

Mr. Herrold, an employee of the Railway Company, testified that under certain circumstances this rule applied but he did not describe under just what circumstances it would be applicable. The rule on its face would not seem to require a trainman on the rear end of a string of cars which was being pushed in a switching movement in the yards. No question was asked of the witness as

to the Railway Company's interpretation of this rule, nor was the witness asked to state the practice in the yards here in question, as evidence which might assist the court in determining the correct interpretation of the rule.

■■ Admittedly, at the time of the accident the crane boom—60 feet long—had been lowered to such a position that the bucket on the end of the crane rested on the ground. In that position the lights on the boom were some distance from the crane car and only a short distance from the ground. These lights were probably directed in the other direction from the crane and toward the ground. The string of cars approached the crane car from the rear on the same track on which the crane was standing. So far as Best knew there were no lights on the rear of the crane car at the time of the collision. Under these circumstances the boom lights might not have been visible to a man on the front end of the approaching cars and, if they had been visible to a man in such a position, the lights would not have been on the track where the crane car was standing, but in the space between that track and the next track to the right. In that position they would not necessarily indicate that the track on which the crane car stood was blocked. Under these circumstances we cannot say as a matter of law that a trainman riding on the front end of the cut of cars would have been able to have seen the dangerous situation in time to have avoided the collision. We think that the above evidence furnished a sufficient basis for the finding of the trial court that the failure to have a man riding on the front end of the string of cars was not the proximate cause of the accident. We cannot say that the finding of the trial court to that effect was clearly erroneous and we therefore may not set it aside. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

But the plaintiff insurance company argues that the lease of the crane to the Steel Company and its delivery to the Steel Company, pursuant to and under the terms and conditions of the letter of Gray & Company dated January 11, 1951, and the purchase order of the Steel Company, constituted a contract of bailment of the locomotive crane; and that, since the crane was delivered to the Steel Company in good condition and was damaged in the course of the work it was performing under the bailment contract, the plaintiff had as a matter of law established a prima facie case against the Steel Company which without further evidence entitled the plaintiff to a judgment. However, the trial court found that by the terms of the contract between the Steel Company and Gray & Company, the Steel Company had "assumed no responsibility for the loss of or damage or injury to the locomotive crane during the period of the lease."

■ In the first place, it must be borne in mind that the plaintiff insurance company as the subrogee of Gray & Company stands in the shoes of Gray & Company. The plaintiff, therefore, has the same rights as Gray & Company, the subrogor, could have asserted as against the two defendants, but the subrogee could assert no rights against the defendants which the subrogor did not have.

In the early case of Phoenix Ins. Co. v. Erie & Western Transportation Co., 117 U.S. 312, 314, 6 S.Ct. 750, 751, 29 L.Ed. 873, a provision of the contract of carriage by vessel of a cargo of grain stipulated that the "carrier shall be and is, in consideration of so receiving the same for carriage, hereby exempted and released from all liability for loss." By another provision of the contract of carriage the transportation company was to have the benefit of any insurance which the owners placed upon the grain. The owners of the grain procured a policy of insurance against the loss of the grain. A loss having occurred on the voyage, the insurance company paid the loss and then filed a libel in admiralty charging that the loss was caused by the negligence of the carrier. The Supreme Court there held that the insurer could take nothing by subrogation except the rights of the insured grain owners which they

had under the contract of carriage, and that by the contract of carriage the grain owners had surrendered their rights to recover. The Court there said, 117 U.S. at page 321, 6 S.Ct. at page 754:

"The right of action against another person, the equitable interest in which passes to the insurer, being only that which the assured has, it follows that if the assured has no such right of action none passes to the insurer; and that if the accused's right of action is limited or restricted by lawful contract between him and the person sought to be made responsible for the loss, a suit by the insurer, in the right of the assured, is subject to like limitations or restrictions."

In Santa Fe, P. & P. R. Co. v. Grant Bros. Const. Co., 228 U.S. 177, 33 S.Ct. 474, 476, 57 L.Ed. 787, the railway company contracted with Grant Bros. to do certain grading for a branch line. As part of this contract the railway company agreed to haul over its line at a reduced rate the necessary equipment, supplies and men of the construction company. The contract there contained a provision that "all risk of loss or damage [was] to be borne by the contractor." Part of the equipment of the contractor was destroyed by fire and the contractor contended that the loss was due to the negligence of the railway company. The Supreme Court held that the provisions in the contract that the contractor was to bear all loss or damage prevented the contractor from recovery for its loss. The Court there said, 228 U.S. at page 189, 33 S.Ct. at page 478:

"The parties were on an equal footing. The risk of loss or damage to the grading outfit or supplies from any cause, while being transported over the line of the railway company, could be assumed by one party or the other, as they saw fit. This risk was an item which naturally would enter into the calculations of the parties with respect to the rate to be charged by the railway company. We are not at liberty to revise the contract, and the question simply is whether the stipulation against liability, in view of the reduced rates, covered all losses,—those which might be due to the carrier's neglect, as well as others."

■ There are many decisions concerning the liability of bailees for damage to or loss of property which is the subject of the bailment. Most of these decisions agree that the liability of the bailee may be limited by the contract of bailment which the parties make. Many of these decisions distinguish between "ordinary bailees" and "professional bailees." In an analysis of such cases in 175 A.L.R. at page 117, it is pointed out that when a bailee receives possession of the property of another for the benefit of both parties, he will often insist upon a stipulation in the bailment contract intended to relieve him of liability even for negligent injuries to the property while it is under his control. It has been held that the general rule, to the effect that parties between whom there is no great disparity of bargaining power may agree to exempt one of them from liability for his negligence, also applies in the case of the ordinary bailee, especially if the exemption only attempts to protect the bailee from the consequences of its agent's negligence. This annotation points out that the operators of parcel check rooms, parking lots, automobile garages and warehouses are to be considered as "professional bailees," and as such are subject to more rigid rules. Under the above definition and examples, it seems clear that the bailee here would be classed as an "ordinary bailee" rather than as a "professional bailee," and would therefore be subject to less rigid rules.

In the instant case the bailor, Gray & Company, was engaged in the regular business of leasing its equipment to corporations, including the Steel Company, to perform work for the lessees. Under the facts of this case as disclosed by the evidence there was no disparity in bargaining power between the parties to the contract as to the lease of the

crane, and there is no reason to think that the $20.00 per hour rental for the crane did not include payment to Gray & Company for releasing the Steel Company and its subsidiaries from liability for all possible damage to or loss of the crane no matter what caused the damage or loss, even including damages resulting from the negligence of the employees of the defendant corporations.

As said in 8 C.J.S., Bailments, § 22, p. 255:

"The rights, duties, and liabilities of the bailor and the bailee must be determined from the terms of the contract between the parties, whether express or implied. Where there is an express contract, the terms thereof control, since both the bailor and the bailee are entitled to impose on each other any terms they respectively may choose, increasing or diminishing their rights, and their express agreement will prevail against general principles of law applicable in the absence of such an agreement."

Also in 8 C.J.S., Bailments, § 24, p. 257, it is said:

"Rights and liabilities, as to repairs, under express contracts are, of course, controlled by the terms thereof."

In this case the contract between the parties, by Conditions 4, 7 and 9 of the Steel Company's purchase order, made it clear that there was to be no liability on the defendants even though the damage to the crane, "equipment not owned by the" Steel Company, was caused by the negligence of the employees of the defendants. Admittedly such a contract must be strictly construed against the party seeking to avoid liability from its negligence or the negligence of its employees. But we think

that the trial court here, after considering the conditions of this contract, correctly concluded that: "Unquestionably the purpose of the Steel Company was to relieve itself from liability from its own negligence. I don't think there is any doubt about that. They didn't want to take any liability at all. You can't blame them for that. * * * I think it is clear that the Steel Company didn't want to be liable for anything except $20.00 an hour, 24 hours a day, seven days per week and for the wages of the two employees [of Gray & Company] on the days that the crane didn't work."

We think, as the trial court did, that the collision here clearly came within the descriptive words of these conditions of the contract between the parties, in that the collision and the resulting damage to the crane were in a manner caused by, arose from, were incident to, or were connected with or grew out of the work for which the crane was leased. The crane was to be used in the Steel Company's yards, and one of the hazards incident to such use would be the possibility of the crane's being struck by engines or cars of the Railway Company. This was therefore a hazard for which Gray & Company by the contract assumed full responsibility. Since Gray & Company had no right of action against the defendants, it necessarily follows that Gray & Company's subrogee, the plaintiff insurance company, could acquire no rights against the defendants either by subrogation or by assignment. The finding and judgment against the plaintiff were therefore necessary even if the plaintiff had shown that the damage to the crane was caused by the negligence of the defendants or of either of the defendants.

The judgment of the District Court is Affirmed.