**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellant,**

v.

**MORGAN DYEING AND BLEACHING COMPANY, Defendant-Appellee.**

**No. 12351.**

United States Court of Appeals Seventh Circuit.

Jan. 12, 1959.

Arthur J. Baer, Jr., Chicago, Ill., David M. Burrell, Freeport, Ill.., Clarence R. Conklin, Chicago, Ill. (Heineke, Conklin & Schrader, Chicago, Ill., Burrell & Holtan, Freeport, Ill., of counsel), for appellant.

James C. Leaton, Chicago, Ill., Spencer E. Irons, Chicago, Ill. (McKinney, Leaton & Smalley, Chicago, Ill., of counsel), for defendant-appellee.

Before FINNEGAN, PARKINSON and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiff-appellant, (hereinafter referred to as "North America"), as subrogee, brought this suit in two counts against defendant, (hereinafter called "Morgan") to recover $38,457.19 for damage to yarn of plaintiff's insured, Straus Knitting Mills, (hereinafter called "Straus"), from water escaping through a dry line sprinkler system in Morgan's warehouse on November 4, 1951.

Count I is based on the theory that Morgan breached its bailment agreement in failing to exercise due care. Count II is based on the theory that North America is entitled to the benefit of insurance carried by Morgan. It was stipulated by the parties that at the time of the occurrence in question, Morgan had three policies with Aetna Insurance Company,

(hereinafter called "Aetna"), which were staggered as to expiration dates and identical as to provisions; that the total amount of the three policies was $850,000, and that for the purpose of passing upon the questions here presented, only one policy was offered and admitted in evidence.

This cause, together with a suit involving similar issues, was tried by the District Court without a jury.[1] In this cause the District Court found against North America who appeals on the ground that the District Court entered erroneous findings of fact and improper conclusions of law.

Morgan maintained a yarn processing plant in connection with which it stored yarn awaiting processing. Morgan's warehouse was equipped with what is commonly called a dry line sprinkler system. Such a system is operated on the principle that no water is contained in the airtight sprinkler pipes, but when a rupture in the line occurs, as when fire melts a sprinkler head, or where otherwise air is allowed to escape from the pipes, water then flows into the system for the purpose of extinguishing fire.

The yarn was packed in marked bags or cartons and stored in tiers on the floor.

For a number of years, Morgan had issued yarn receipts to its customers reading:

"Yarn Receipt
"Morgan Dyeing & Bleaching
   Company Incorporated
"Rochelle, Illinois

"Date Goods Received........

| Bale or Case | Size and Grade | Lot | From | Pounds |
|---|---|---|---|---|

"We agree to indemnify you for loss or damage to your property caused by the perils of fire, extended

coverage, and sprinkler leakage, as described in, and to the extent of, our insurance policies. Morgan Dyeing & Bleaching Co."

Henry Kaminski, Morgan's office manager and assistant treasurer, testified that after discussion of insurance with Straus, the following exchange of correspondence took place.

"January 10, 1951.
"Straus Knitting Mills
"350 Sibley Street
"St. Paul 1, Minnesota
"Attention: Mr. Harry A. Straus

"Dear Harry:
"In order to complete our insurance file covering fire protection on your yarn stored in our warehouse, would you kindly send us a letter stating to the effect that this yarn is covered by your insurance policy.
"We will therefore be in a position to justify eliminating the valuation of your yarn from our insurance policy.
"Thanking you in advance for your co-operation, we remain,
   "Yours very truly
   "Morgan Dyeing & Bleaching Co.
   "Henry Kaminski"

"January 23, 1951
"Mr. Henry Kaminski
"C/o Morgan Dyeing & Bleaching
   Co.
"Rochelle, Illinois

"Dear Henry:
"Replying to your letter of January 10th, please be advised that the yarns you carry in stock as per the monthly inventory report are covered by our insurance.
"This, of course, does not include the Cotton yarns which you buy for our account.

---

[1]. In the companion case, Zwicker Knitting Mills v. Morgan, No. 53 C 33, brought by bailor itself and not as here by its sub-

rogee, the District Court entered judgment for the plaintiff which has been satisfied and is not here at issue.

"Trusting this is the information you desire, we are,

"Sincerely yours,
"Straus Knitting Mills
"Harry A. Straus
"Plant Superintendent"

Thereafter Morgan altered the receipts issued to Straus by obliterating the printed legend:

"We agree to indemnify you for loss or damage to your property caused by the perils of fire, extended coverage, and sprinkler leakage as described in, and to the extent of, our insurance policies."

Morgan made no specific charge for storage to customers whose yarn was processed. No reduction was made in the general charges after the change in the form of receipt. However, Straus continued to make use of Morgan's service, which Morgan continued to provide, after the exchange of correspondence, alteration in the form of receipt, reduction in Morgan's insurance premium, and maintenance of the same general charges.

Morgan's three policies described above extended coverage to property of Morgan's customers in Morgan's custody and control.

Morgan was required to report to its insurer Aetna, monthly, in a single total figure, the value of all property on hand at the close of each month. Such reports did not identify the property as to individual customers. The amount of the premium paid by Morgan was directly affected by the monthly reports.

After the correspondence quoted above, Morgan, for the period from January 1, 1951, until November 4, 1951, eliminated from its monthly report an amount equal to the value of Straus' property as held from month to month during that period.

On Sunday, November 4, 1951, in the afternoon, Morgan's chief operating engineer heard the sprinkler system alarm. On investigation he found water spraying from a broken pipe, shut off the main valve at the other end of the adjoining building, to stop the flow, and returned to find about three inches of water on the floor, and to find that yarn had been soaked over an area of some 1500 square feet, including yarn belonging to Straus. Timely action on the part of Morgan's employees to preserve the yarn minimized the loss.

The total loss to all property approximated $175,000. Morgan filed claims with its insurer Aetna, for losses sustained by some customers, but not for that sustained by Straus.

Straus then claimed under its floater policy with North America which, subject to conditions not relevant here, covered property of Straus wherever located. The fair market value immediately prior to loss was $56,567.60. Recovery from sale of damaged yarn was $18,110.41. By settling with Straus, North America sustained a net loss of $38,457.19 for which it called on Morgan to file claim with Morgan's insurer Aetna. On Morgan's refusal to file such claim, North America brought this action.

North America contends that the Trial Court's findings of fact are clearly erroneous, being unsupported by and contrary to the evidence; that Morgan has failed to establish that the damage was not caused by lack of due care by Morgan as bailee, or that there was any undertaking by Straus to insure for the benefit of Morgan as bailee.

■ This Court may not substitute its judgment for that of the Trial Court where findings of fact are not clearly erroneous. Graver Tank & Mfg. Co. v. Linde Air Products Co., 1949, 336 U.S. 271, 275, 69 S.Ct. 535, 93 L.Ed. 672; Simmons Co. v. A. Brandwein & Co., 7 Cir., 1957, 250 F.2d 440, 445.

■ Search of the testimony does not, as contended by North America, show lack of competent evidence to support the findings of the Trial Court.

Testimony of Morgan's employees did affirmatively show due care, in installation and regular check of the system used, to warrant a finding by the Trial

Court that Morgan was guilty of no lack of due care. Testimony as to the finding of a piece of ice, seven or eight inches long and about one inch in diameter, was properly considered as circumstantial evidence.

Morgan's witness, R. H. Schrock, was qualified as an expert. At the time of the trial, he had been employed by Rockford Industries in the automatic sprinkler department; he had been with Rockford for twelve years; he had worked with sprinklers since 1914, and had dealt with hundreds of sprinklers such as the one here concerned. His opinion as to the cause of the mishap based on the facts given to him by others as stated in his testimony, as well as on his own knowledge of the type of system and later observation of the premises, considered by him in the light of his long and varied experience, cannot be dismissed as mere conjecture. His diagnosis of the trouble does support the findings of the Trial Court that the break was caused by freezing of water in the pipe which failed to drain into the drip drums because of a slight low spot in the system, imperceptible to visual inspection, which may have occurred after installation of the system, as a result of the settling of the building.

The exchange of correspondence and the subsequent alteration of the form of the receipts clearly indicated that it was the intention of the parties that Straus would rely solely on its own and not on Morgan's insurance. North America is in no better position than its subrogor-insured Straus and is vulnerable to all defenses which might be raised to the claim of Straus. Insurance Company of North America v. E. J. & E. Ry. Co., 7 Cir., 1956, 229 F.2d 705, 711.

North America argued that the evidence did not support findings numbered 18, 20, 21, 28, 29, 32, 34, 35, 36, and 37.

The District Court's finding No. 18 that a twice weekly check was made was supported by the evidence of the maintenance man who testified that the pressure gauge was checked weekly and the drip drums twice weekly. He did have to refresh his memory from a statement he himself had previously made that he checked these items on the day before the occurrence. He connected the two events in his own mind because the damage occurred on a Sunday which was not a regular working day for him.

Findings No. 20 and No. 21 that the break in the pipe was caused by freezing water were reasonable deductions from the evidence of the watchman that he had found a broken pipe when he responded to the alarm, about half an hour after he had made an inspection, that the temperature had been at freezing point, but was beginning to rise, that he had found the ice on the floor which had not been there when he last inspected, and the diagnosis of Morgan's expert witness, Schrock.

The remaining findings to which objection is made deal with the matter of insurance, and are supported by testimony of Morgan's witness, Kaminski, its office manager and assistant treasurer, and reasonable inferences therefrom as heretofore set out.

North America argues that although the premiums paid by Morgan were affected by Morgan's monthly reports, the amount of insurance coverage was not affected. This argument is based on the fact that the endorsement to the policy provided.

" * * * additional insurance is hereby made effective under and subject to the provisions and stipulations of this policy during the term of this endorsement, for an amount equal to its pro rata proportion of the difference between 90% of the value of the property covered by this policy and the aggregate amount of insurance (without reference to insurance provided by the interim endorsements) under all policies containing similar interim endorsements, but not exceeding twenty-five per cent (25%) of the insurance under this policy without

this interim endorsement, or its pro rata proportion of One Million Dollars ($1,000,000), whichever is the least.

"If the policy contains more than one item, the amount of insurance provided by this interim endorsement shall apply proportionately to each item.

"It is a condition of this interim endorsement that the Insured shall furnish the Factory Insurance Association within thirty days after the last day of each month, a statement of the insurable value of all property covered by this policy as of the last day of each month. Adjustments based on these statments shall be made annually or as required at current rates."

Further, North America contends, the premium on the basic coverage, $850,000, would not have been lessened regardless of the figure reported monthly.

North America reasons as follows:

1. The insurance coverage of $850,000 was in fact more than sufficient to cover all the actual losses, approximately $175,000, arising out of this catastrophe.

2. Morgan's monthly reports consisted of a single total figure, without identifying individual customers.

3. Morgan's own intention or understanding as to the amount of coverage is not controlling.

4. The fact that all yarn, including that of Straus, was ticketed to show its ownership is irrelevant here.

5. Hence the Aetna policies cover all the yarn in the Morgan warehouse.

6. Morgan's reports operated to lower its premium payments, but not its insurance coverage.

7. Hence, North America is entitled to indemnity from Aetna.

The fallacy in North America's argument, as outlined above, is apparent. The adequacy of Morgan's insurance to cover Straus' yarn cannot be determined by the after-discovered fact that the coverage was sufficient to pay a single partial loss.

There is ample evidence to support the findings and conclusion that the Straus yarn was not covered by the Aetna policies.

Under the facts of this case as shown by the evidence and under the applicable law, we think the judgment of the Trial Court may not be disturbed.[2]

Judgment affirmed.

---

2. Judge Finnegan heard oral argument and participated in the decision of this case, voting to affirm. He died before expressing his views with respect to this opinion.